IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NOEL T. DEAN | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | |
| | § | C.A. No. _____ |
| | § | JURY |
| HARRIS COUNTY; CITY OF | § | |
| HOUSTON; MILLARD F. WATERS; | § | |
| DARSHAN R. PHATAK; LUIS A. | § | |
| SANCHEZ; and DWAYNE A. WOLF | § | |
| | § | |
| Defendants | § | |

## PLAINTIFF NOEL DEAN'S ORIGINAL COMPLAINT

1.     This action arises from serious medical examiner (ME) and police officer misconduct, including fabrication and manipulation of evidence and commingling. On January 30, 2008, Noel Dean was wrongfully indicted for murder of his wife Shannon Dean, and tried twice for murder on or about January 2009 and January 2011 as a direct result of the acts and omission of the Harris County Institute of Forensic Sciences (HCIFS), formerly known as Office Of The Medial Examiner of Harris County, Medical Examiner Darshan Phatak, Chief Medical Examiner Luis A. Sanches, Deputy Chief Medical Examiner Dwayne Wolf, the Houston Police Department (HPD) Homicide Department, HPD Detective Millard Waters, Harris County (The County), and the City of Houston (The City).

2.     After spending more than three years defending himself against a murder charge, a crime he did not commit, charges against Noel Dean were dismissed mid-trial after Medical Examiner Phatak's improperly conducted autopsy, false autopsy report, and inconsistent testimony were exposed. After such exposure, the HCIFS reviewed the evidence a second time and generated a

second report. The results demonstrated that the evidence, testimony, and autopsy report prepared by Phatak, along with the reports and results of the investigations of the Houston Police Department, had been utterly wrong and, in some respects patently fabricated.

3. Defendant City of Houston caused the wrongful indictment and three-year trial of Noel Dean. The City's policies or customs regarding its Police Department's investigative techniques and the City's inadequate training and supervision of police officers and detectives all contributed to this injustice. The City, by and through its final policymakers and supervisors of the HPD, was deliberately indifferent to the known or obvious consequences of HPD's policies or customs, which was that innocent men and women would be wrongfully indicted based on illegal custodial interrogations, misrepresented and fabricated witness testimony and affidavits, and biased and police-influenced autopsies and ME death investigations.

4. The Houston Police Department caused the wrongful indictment and three-year trial of Noel Dean. HPD officers and supervisors, from the outset, branded Noel Dean guilty of murder and focused their investigation on him, immediately ruling out the real possibility of suicide as a manner of death, despite knowing that (1) the complainant had a history of suicide attempts, (2) the complainant had written two letters describing her depression and suicidal thoughts, (3) the complainant had contemplated using Noel Dean's gun to commit suicide, (4) there were no signs of violence or a struggle at the scene, (5) Noel Dean's statements regarding the incident proved to be true, and (6) gun-shot residue evidence was inconclusive. In their effort to convict Noel Dean of murder, HPD Detective Millard Waters interrogated Noel Dean without providing Miranda Warnings when Noel Dean was a suspect in custody. Detective Waters fabricated and manipulated Noel Dean's statements and presented such fabrications in his Probable Cause

Affidavit and as a witness at trial, failed to disclose material evidence to the ME's office, and negatively influenced Medical Examiner Phatak's death investigation and autopsy.

5.      The conduct of HPD Detective Waters was made possible by the City's and HPD's practice of inadequately training or supervising its employees and their policy or custom of allowing officers to conduct custodial interrogations without providing the required Miranda Warnings, to create false and misleading affidavits, to manipulate and shape suspects' statements, and to invade the province and neutrality of the HCIFS's investigation by attending and participating in autopsies and medical examiners' death investigations. Had such policies or customs not existed, an innocent man would not have been indicted for murder and spent three years of his life defending his innocence and protecting his freedom. The City, by and through its final policymakers for the HPD, was deliberately indifferent to the known and obvious consequences of such policies or customs regarding criminal investigations, which was that innocent persons would be indicted, forced to defend their name and freedom, and put their lives on hold for several years due to inadequately trained and supervised employees, manipulated evidence, and biased, police-influenced autopsies and ME death investigations.

6.      The Harris County Institute of Forensic Sciences (HCIFS), formerly known as the Office of The Medical Examiner of Harris County, caused the wrongful indictment and three-year trial of Noel Dean. Medical Examiner Darshan Phatak allowed HPD Detective Waters to attend, participate, and negatively influence Phatak's death investigation and autopsy of the complainant-decedent whom Noel Dean allegedly murdered. Phatak prematurely eliminated "undetermined" – one of the four manners of death classifications – before completing a thorough investigation and considering all the available information. Phatak misrepresented his findings at trial and provided inconsistent, flawed witness testimony.

7.     The conduct of Medical Examiner Dr. Phatak was made possible by HCIFS's and the County's practice of inadequately training or supervising their employees and HCIFS's and the County's policy or custom of allowing HPD officers to attend and participate in autopsies and ME death investigations, and allowing medical examiners to prematurely eliminate manner-of-death classifications and provide misrepresented and inaccurate witness testimony. Had such policies or customs not existed, an innocent man would not have been indicted for murder and spent three years of his life defending his innocence. Harris County, by and through its policies or customs, was deliberately indifferent to the known and obvious consequences of its policies or customs, which was that allowing overzealous HPD officers to attend and participate in autopsies would negatively influence medical examiners' findings and reports, resulting in biased findings and innocent persons being charged with criminal acts.

8.     Defendant Harris County also caused the wrongful indictment and three-year trial of Noel Dean. The County's official policies or customs, as promulgated and carried out by HCIFS's final policymaker, the Chief Medical Examiner, allowed HPD officers and detectives to predispose and negatively influence autopsies and ME death investigations through their attendance and participation therein, and allowed medical examiners to prematurely eliminate manner-of-death classifications and provide inaccurate witness testimony. The County was deliberately indifferent to the known and obvious consequences of such policies or customs, which was that the ME's death investigation would be negatively influenced, resulting in improper manner-of-death conclusions and innocent persons being wrongfully indicted for criminal offenses.

## JURISDICTION AND VENUE

9.    The Court has jurisdiction under 28 U.S.C. §1331.

10.    Venue is proper in the Southern District of Texas under 28 U.S.C. §1391(b), because that is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## PARTIES

11.    Plaintiff Noel Dean is an individual residing in Houston, Texas.

12.    Defendant City of Houston is a home-rule city located in this judicial district. Defendant City of Houston is sued for the constitutional harm suffered by Plaintiff as a result of its policies or customs and failure to adequately train or supervise its police officers and detectives with respect to permitting its officers to conduct illegal custodial interrogations, to fabricate and manipulate suspects' statements, to fabricate and misrepresent affidavit facts, and to allow officers to predispose and influence HCIFS's autopsies and death investigations; and thus for matters pertaining to the management and administration of the HPD office.

13.    Defendant Harris County is a duly designated county of the State of Texas. Harris County is sued for the constitutional harm suffered by Plaintiff as a result of the County's official policies or customs and failure to adequately train or supervise its HCIFS medical examiners with respect to the County's due process obligations of providing a proper and neutral, impartial death investigation, separate and apart from law enforcement, permitting HPD officers and detectives to influence HCIFS autopsies and death investigations, permitting medical examiners to prematurely eliminate manner-of-death classifications and provide misrepresented and inaccurate witness testimony; and thus for matters pertaining to the management and administration of the HCIFS office.

14.     Defendant Darshan R. Phatak, M.D. was an Assistant Medical Examiner of the Harris County Institute of Forensic Sciences at the time of the investigation and trials of Noel Dean and is sued in his individual capacity.

15.     Defendant Luis A. Sanchez, M.D. was Chief Medical Examiner of the Harris County Institute of Forensic Sciences at the time of the investigation and trials of Noel Dean.  Defendant Sanchez had supervisory authority over Defendant Phatak and is sued in his individual capacity.

16.     Defendant Dwayne A. Wolf was Deputy Chief Medical Examiner of the Harris Examiner of the Harris County Institute of Forensic Sciences at the time of the investigation and trials of Noel Dean.  Defendant Wolf had supervisory authority over Defendant Phatak and is sued in his individual capacity.

17.     Defendant Millard Waters was a HPD Detective at the time of the investigation and trials of Noel Dean, and is sued in his individual capacity.

## FACTS

### A.     Background of Events and Shannon Dean's Suicide.

#### a. Background of Events.

18.     On July 29, 2007, Noel Dean and his wife, Shannon Dean, had a get-together at their house located at 3615 Briley, Houston, Texas.  About ten of their friends and/or family attended. They ate, drank alcohol, and listened to music.

19.     The party continued beyond midnight and into the early morning of July 30, 2007.

20.     Sometime after midnight, Shannon Dean, due to her intoxication (later determined to be a blood-alcohol-content of .19), went to the master bedroom to lie down.  Noel Dean attended to her, holding her head up while she vomited.  As guests were requesting Noel's assistance on an

unrelated incident outside the house, Noel left Shannon lying on the bedroom floor with her elbow supporting her head so she would not choke if she continued to vomit.

21.    Moments later, after attending to the commotion outside, Noel drove an intoxicated guest home.

22.    Noel Dean returned to his house about one hour later. Only Noel, Shannon, and a friend remained at the residence. The friend was asleep in the guest bedroom.

23.    Shannon was still in the master bedroom, but awake and sitting up on the floor when Noel returned to the master bedroom. As Noel explained the events of the night to her, Shannon moved from the floor to the bed.

24.    Noel checked his phone and Shannon's phone for any messages regarding the earlier commotion and status of the guests.   On Shannon's phone, Noel read a text message conversation between Shannon and her male co-worker that portrayed her marital infidelity. Shannon had been unfaithful to Noel on prior occasions and Noel had seen this co-worker act touchy-feely with Shannon.

25.    An argument ensued regarding Shannon's infidelity. Noel tried to explain that since they have made it through her prior acts of infidelity, they could get through this as well. Shannon was mad, irrational, and unwilling to hear Noel. As a result, Noel became angry himself and hit his hands against the wall.   Thereafter, Noel retreated to the master bathroom to open the window and calm down. Through his peripheral vision, it appeared to Noel that Shannon was darting out of the master bedroom.

26.    Shannon had a history of depression and suicide attempts. On a prior occasion, Shannon had run off, locked herself in the guest bathroom, and cut herself on her wrist with a straight-edge shaving razor.

27.    In an attempt to stop Shannon from leaving and potentially hurting herself again, Noel ran to the master bedroom door to cut Shannon off. But, instead of going to the door, Shannon went to the dresser drawer where Noel kept his gun. Shannon grabbed the gun, climbed over the bed, ran toward the bathroom, and attempted to close the door behind her. Noel, in pursuit of her, stopped the door from closing.

28.    Shannon lied on the bathroom floor and put the gun to her head. Noel stood in the doorway. Shannon asked "Is this what you want?" Noel answered "no." Shannon pulled the trigger and shot herself in the head. Shannon died as a result.

29.    Noel called 911. The 911 operator told Noel to give Shannon chest compression and to put a towel and pressure on the wound. Noel did such, but to no avail.

30.    HPD officers Gary and Matson arrived at the scene at 4:15 on the morning of July 30, 2007. Officers Gary and Matson first observed the scene, and then obtained a statement from Noel. Immediately thereafter, Noel was placed in the back of Officer Edwards' police car. When Officer Edwards left, at 6:50 A.M., Noel was placed in the back of Officer Gary's and Matson's police car. When they were relieved, Noel was placed in the back of Officer Castor's police car.

31.    During this period of time, and at the request of Officer Pena, Noel voluntarily submitted to a gun-shot residue test. The test later proved to be inconclusive.

32.    Although Noel repeatedly asked to be let out of the police cars and for the window to be rolled down so he could get some air, the officers refused. The door was opened only once, when the officers performed the gun-shot residue test. The officers also refused to provide Noel with shoes.

33.     At 7:50 A.M., Defendant Investigator Waters arrived on the scene.  He and his partner, Sergeant Brooks, split their duties.  Brooks worked the scene and Defendant Waters worked the witness/suspect side of the scene.  Defendant Waters first interviewed Doneshia Blount, the only remaining guest at the time of the incident.  Defendant Waters decided to interview Noel, not at the scene but instead at the Homicide Division Office.

34.     Officer Castor transported Noel from his residence to the Homicide Division Office and released him to Defendant Waters.

### b. *Shannon Dean Committed Suicide*

35.     Documents recovered from Shannon's personal digital assistant (PDA) revealed many emotional issues.  In one document, dated January 31, 2007, she voiced her thoughts of feeling unworthy, and how she could not be forgiven for her sins even though that is all she ever wanted. She expressed feelings of self-destruction and self infliction of pain.  She had written of wanting to hurt herself and had contemplated using Noel's gun to end it all.  She mentioned that this thought arose when she saw Noel cleaning the gun.  She described being locked in a bathroom with a razor blade to her arm and liking the feeling that it brought her.

36.     A second document, dated April 12, 2007, was an apology to Noel, further showing Shannon's internal conflictions.

37.     Shannon, during counseling sessions, admitted to her church Elders that she had attempted to commit suicide.

38.     Shannon had attempted suicide on two previous occasions, once by cutting her wrist and a second time by ingesting pills.  The autopsy revealed a linear scar on Shannon's left arm near her wrist on the underside that could have been self-inflicted.  Shannon's mother confirmed that she gave Shannon pain pills.

39.    The gunshot wound was a contact wound with no stippling and is not uncommon for a self-inflicted wound.

40.    On or about January 2011, after two trials and a second autopsy report, Shannon's manner of death was concluded as "undetermined."

### B.    Defendant Waters Branded Noel a Murderer from the Outset and Improperly Conducted the Homicide Investigation.

#### a.    Defendant Waters Conducted an Illegal Interrogation of Noel.

41.    Defendant Waters' interrogation of Noel began at approximately 9:30 A.M. on the morning of July 30, 2007.

42.    Defendant Waters did not provide Noel with the Miranda Warnings.  Waters indicated to Noel that he was not under arrest or in custody and described the interview as "non-custodial." However, during the interrogation it is clear that Noel is a suspect.  And, Noel did not feel free to leave.  Defendant Waters, more than once, clearly stated that he believed Noel murdered Shannon.  Moreover, Waters stated in his police report, in reference to the interrogation, that he spent an hour and one-half – after Noel explained the facts – in an "effort to draw the truth out of Noel."

43.    At 11:40 A.M., Defendant Waters terminated the first interrogation.

44.    Between the first and second interrogation of Noel, Doneshia Blount gave Defendant Waters a sworn statement at the Homicide Division Office.  She verified many of Noel's statements, including: (1) Noel attended to Shannon in her intoxicated state and rested her head on her arm so she wouldn't choke, and (2) Noel was on speaker phone with 911 performing CPR after Shannon shot herself.

45.    At 1:55 P.M., Defendant Waters begins his second interrogation of Noel.  Again, Waters indicated to Noel that he was not under arrest or in custody, he described the interview as "non-

custodial," and he did not provide the Miranda Warnings. Nonetheless, Defendant Waters believed Noel shot and killed Shannon and Noel believed he was not free to leave. Noel was without shoes, money, or transportation.

46.    At 3:20 P.M., Defendant Waters terminates the second and final interrogation.

### b. *Waters Fabricated and Manipulated Noel's Statements and Actions.*

47.    During the interrogation, Noel adamantly explained that Shannon had shot herself. When Noel stated such, he used his hand as a gun and placed is index finger to his right temple.

48.    Defendant Waters twisted this demonstration to fit his pre-set theory that Noel murdered Shannon. In his offense report, for which Phatak and the Office of the District Attorneys relied on, Waters stated that "on three occasions [he] asked Noel to demonstrate how Shannon had held the pistol." No such particularized demonstration was ever requested. Instead, Noel simply made the demonstration as a visual accompaniment to his verbal explanation that Shannon shot herself.

49.    Waters stated in his report that Noel demonstrated how Shannon had held the pistol "to signify the front sight had been at about eleven or twelve o'clock on Shannon's temple/head, with the stock/magazine well pointing down toward her feet." Noel said nothing about the angle of the pistol relative to a clock arm or any other angle of measurement.

50.    Noel was never asked: "was the gun at this or that angle," "was the gun pointed upward or downward," or "was the gun to the left or right." Noel was never asked: "show where the sight was and where the rod was."

51.    Waters twisted this demonstration to fit his pre-set theory that Noel murdered Shannon.

52.     The trial hinged on this evidence.  In fact, Phatak would not have ruled Shannon's death a homicide if the gun demonstration, and Waters' manipulation thereof, were absent from Phatak's investigation.

53.     In addition, Waters misrepresented Noel's behavior during Noel's 911 call.  In his report, Waters described Noel's demeanor during the call as showing very little emotion.  Yet, in the call, Noel is crying, hollering, and pleading for help.

### c.  *Waters Improperly Influenced and Biased the Medical Examiner's Autopsy and Death Investigation.*

54.     On July 31, 2007, Dr. Darshan Phatak performed the autopsy of Shannon Dean. Defendant Waters attended and participated in the autopsy.

55.     Defendant Waters examined the gunshot wound.  Defendant Waters saw what appeared to be an imprint caused by the front sight of the gun and observed the bullet hole in Shannon's head and half circle marks underneath.

56.     Defendant Waters gave Phatak a background on the incident, sharing with Phatak his theory and beliefs regarding Shannon's death.  It was clear to Phatak that Defendant Waters believed Noel murdered Shannon.

57.     On August 6, 2007, Waters met with Phatak and Chief Medical Examiner Sanchez at the office of HCIFS.  They discussed possible scenarios explaining the forensic evidence.

58.     Defendant Waters did not inform Phatak that information existed that Shannon possibly tried to commit suicide before.

### d.  *Waters Fabricated and Misrepresented Facts in his Probable Cause Affidavit.*

59.     Waters drafted a Probable Cause Affidavit.  This affidavit was presented to a judge for issuance of an arrest warrant of Noel Dean, and presented in the Complaint charging Noel Dean with the felony charge of murder.

PLAINTIFF NOEL  DEAN'S ORIGINAL COMPLAINT                                    Page **12** of **26**

60.    Waters stated that Noel demonstrated how Shannon was holding the gun when she shot herself. Waters stated that "when [Noel] did the demonstration he held the gun in his right hand" and "had his index finger on the trigger and the top [of] the gun was being held upright and perpendicular to [Shannon's] face." First, no such particularized demonstration ever occurred. Second, what demonstration did occur did not include any gun whatsoever. As mentioned, the "demonstration" was that of Noel using his hand and index finger.

61.    Waters stated that a laptop cord that extended from inside the bathroom through the doorway into the bedroom was undisturbed. According to Waters, this was inconsistent with Shannon attempting to slam the bathroom door just before she shot herself. But, Noel had repeatedly told Waters that he had moved items in the bathroom around after Shannon's suicide, and medical first responders had been in the bathroom attending to Shannon. Waters had no way of knowing that the laptop cord was undisturbed.

62.    Attached to the affidavit was a "summary facts." Waters stated that the text message conversation between Shannon and her male co-worker revealed that they were having "a more than platonic affair." While the text messages had sexual connotations, Waters' investigation revealed that Shannon and her co-worker never had sex. The co-worker stated such.

63.    Nowhere in the affidavit does Walters mention any facts pertaining to Shannon's suicidal tendencies, such as her PDA documents, her counseling with church Elders, or her prior suicide attempts.

64.    Waters misrepresented and fabricated facts in his affidavit, which was a direct cause of Noel's arrest, indictment, and three-year trial.

e. *Waters Misrepresented Facts at Noel's Trials.*

65.    Defendant Waters did not take the time to find and interview the Elders with whom

Shannon admitted to attempting suicide.  Waters lied about his efforts as a witness at Noel's first

trial.

66.    Defendant Waters' misrepresentations carried on through Noel's second trial.

### C.    Defendant Phatak Improperly and Negligently Conducted the Death Investigation and Autopsy of Shannon Dean.

a. *Defendant Phatak Performed a Pre-disposed, Biased Autopsy and Death Investigation, Un-separate from Investigator Waters' Investigation.*

67.    The responsibility of HCIFS medical examiners is to determine the cause and manner of

death.  One of the foundations of forensic pathology (a medical examiner) is to carry out neutral,

impartial death investigations, separate and apart from law enforcement.

68.    On July 31, 2007, Dr. Darshan Phatak performed the autopsy of Shannon.

69.    Defendant Phatak allowed Waters to attend and participate in the autopsy. Defendant

Phatak allowed Waters to examine the gunshot wound and make determinations such as the

cause of an imprint near the gunshot wound.   Phatak asked Waters questions about what Waters

"knew" happened at the scene or to Shannon.

70.    Defendant Phatak received a background on the incident from Waters and his theory and

beliefs regarding Shannon's death.  It was clear to Phatak that Defendant Waters believed Noel

murdered Shannon.

71.    On August 6, 2007, Phatak and Chief Medical Examiner Sanchez met with Waters and

Detective Brooks at the office of HCIFS.  They discussed possible scenarios explaining the

forensic evidence.

72.     Phatak's death investigation was, from the beginning, biased and influenced by Waters' attendance, participation, and contribution.

b. *Defendant Phatak Improperly Eliminated a Manner of Death Classification.*

73.     There are five classifications of manners of death resulting from an autopsy: Accident, Suicide, Homicide, Natural, and Undetermined.   The responsibility of HCIFS medical examiners is to consider all the information and evidence available before eliminating or determining a classification.

74.     On August 6, 2007, Phatak and Chief Medical Examiner Sanchez met with Waters and Detective Brooks at the office of HCIFS.  They discussed possible scenarios explaining the forensic evidence.

75.     At the meeting, Phatak concluded that Shannon's death would not be classified as "undetermined."   Phatak concluded that given enough time and enough investigation, Shannon's death would be classified as either a suicide or homicide.

76.     When Phatak made these conclusions, he did not have all the information regarding the circumstance of Shannon's death.

c. *Phatak Viewed Noel's "Demonstration" of how Shannon Shot Herself in Isolation.*

77.     Phatak fast forwarded Noel's video-taped statement to one instance where Noel placed his index finger on his head when explaining that Shannon shot herself.  Phatak viewed less than five minutes of the over four hour video-taped statement.

d. *Defendant Phatak Provided Inaccurate and Inconsistent Witness Testimony and Misrepresented his Autopsy Findings.*

78.     At Noel's trials, Phatak's testimony was riddled with misstatements, inaccuracies, and glaring inconsistencies.

79.   At the second trial, Noel's defense was supported by an independent expert medical examiner.  Such expert had reviewed the evidence and was prepared to testify.  After cross-examination of Phatak, Phatak's misstatements, inaccuracies, and inconsistencies led to dismissal of the charges.

**D.   Defendant City of Houston, Defendant Harris County, the Houston Police Department, and the Harris County Institute of Forensic Sciences caused the wrongful indictment and three-year trial of Noel Dean.**

80.   Noel Dean was indicted for murder on January 30, 2008.  On or about January 2009 and January 2011, Noel Dean twice stood trial for murder.

81.   After spending more than three years defending the charge with evidence showing that Shannon committed suicide, charges against Noel Dean were dismissed.

82.   The conduct of Waters in illegally interrogating Noel, in manipulating and twisting Noel's statements,  in withholding material evidence from Dr. Phatak, in influencing Phatak's autopsy and death investigation, and in misrepresenting and fabricating facts in his Probable Cause Affidavit, caused the wrongful indictment and three-year trial of Noel.

83.   The conduct of Phatak in allowing Waters to influence and bias the autopsy and death investigation of  Shannon Dean, in eliminating a manner of death classification prematurely, and in misrepresenting his autopsy findings, caused the wrongful indictment and three-year trial of Noel.

84.   The conduct of Waters and Phatak in performing a joint autopsy and death investigation and combining what should have been two separate, impartial investigations of Shannon's death, caused the wrongful indictment and three-year trial of Noel.

85.   It is not unusual for police officers or detectives to attend autopsies.  If there is a suspicion of homicide on the part of the police, they will attend the autopsy.

86. During the joint autopsies, officers or detectives ask questions about what the medical examiner is observing. In turn, the medical examiners ask questions about what the officers or detectives "knew" happened at the scene or to the decedent.

87. But for this conduct and the inadequate training or supervision of employees and policies or customs of the City of Houston, Harris County, HPD, and HCIFS of permitting such conduct, Noel Dean would not have been indicted or stood trial for three years.

## CAUSES OF ACTION

88. With respect to each cause of action, Noel Dean incorporates by reference each paragraph of this Complaint.

**Count I:** **42 U.S.C. § 1983 Against Millard F. Waters for Violating Noel Dean's Fourteenth Amendment Due Process and Fair Trial Rights.**

        *a.* *42 U.S.C. § 1983 Against Millard F. Waters for Violating Noel Dean's Fourteenth Amendment Due Process and Fair Trial Rights by Conducting an Illegal Interrogation of Noel.*

89. Millard F. Waters intentionally or recklessly interrogated Noel Dean without first providing him with Miranda Warnings. Waters interrogated Noel for over four hours, resulting in inculpatory statements that caused the wrongful indictment and three-year trial of Noel Dean. During the interrogation, Noel stated that Shannon attempted to slam the bathroom door in the course of events leading up to her death. Noel "demonstrated" how Shannon shot herself by placing his right hand and index finger to his head.

90. Waters presented this evidence in his Probable Cause Affidavit and in the Complaint issued against Noel. The evidence was also introduced at Noel Dean's two trials. The statements were inculpatory because Waters and the prosecutors presented a theory suggesting the bathroom door was not and could not be slammed closed, and a theory that Shannon could not have shot herself the way Noel "demonstrated."

91.     Waters' illegal interrogation denied Noel Dean liberty without due process of law and as a proximate result of Waters' unconstitutional actions, Noel Dean suffered damages.

        b.  *42 U.S.C. § 1983 Against Millard F. Waters for Violating Noel Dean's Fourteenth Amendment Due Process and Fair Trial Rights by Fabricating and Manipulating Noel's Statements and Actions.*

92.     Millard F. Waters intentionally or recklessly fabricated and manipulated Noel's statements and actions.  Waters misrepresented Noel's behavior during Noel's 911 call.  Also, Waters stated in his report that Noel demonstrated how Shannon had held the pistol "to signify the front sight had been at about eleven or twelve o'clock on Shannon's temple/head, with the stock/magazine well pointing down toward her feet."  No such particularized demonstration occurred.

93.     Waters presented this "demonstration" in his offense report and to Medical Examiner Phatak and the Harris County District Attorneys' Office.  The fabricated demonstration was used to create a discrepancy when compared to Dr. Phatak's autopsy findings.  What became a fabricated discrepancy, this was presented in Waters' Probable Cause Affidavit, the Complaint charging Noel with murder, and the two trials.

94.     The trial hinged on this evidence.  In fact, Phatak would not have ruled Shannon's death a homicide if the gun demonstration, and Waters' fabrication thereof, were absent from Phatak's investigation.

95.     Waters' fabrication and manipulation of Noel Dean's statements and actions denied Noel liberty without due process of law and as a proximate result of Waters' unconstitutional actions, Noel Dean suffered damages.

c. *42 U.S.C. § 1983 Against Millard F. Waters for Violating Noel Dean's Fourteenth Amendment Due Process and Fair Trial Rights by Corrupting and Influencing Medical Examiner Darshan Phatak's Autopsy and Death Investigation.*

96.   Waters intentionally or recklessly biased Medical Examiner Phatak's autopsy and death investigation of Shannon Dean. Waters attended and participated in the autopsy. He examined the gunshot wound. He gave Phatak a background on the incident, sharing with Phatak his theory and beliefs regarding Shannon's death – that Noel murdered her.

97.   It was clear to Phatak that Waters believed Noel murdered Shannon. Moreover, Waters did not inform Phatak that information existed that Shannon possibly previously tried to commit suicide.

98.   On August 6, 2007, Waters met with Phatak and Chief Medical Examiner Sanchez at the office of HCIFS and discussed possible scenarios explaining the forensic evidence. At that time, Phatak concluded that Shannon's death would not be classified as "undetermined," but would, instead, be classified as either a suicide or homicide.

99.   Waters' corruption of the ME's autopsy and death investigation denied Noel liberty without due process of law and as a proximate result of Waters' unconstitutional actions, Noel Dean suffered damages.

d. *42 U.S.C. § 1983 Against Millard F. Waters for Violating Noel Dean's Fourteenth Amendment Due Process and Fair Trial Rights by Misrepresenting and Fabricating Facts in his Probable Cause Affidavit.*

100.  Waters intentionally or recklessly misrepresented and fabricated facts he presented in his Probable Cause Affidavit. Waters stated that "when [Noel] did the demonstration he held the gun in his right hand" and "had his index finger on the trigger and the top [of] the gun was being

held upright and perpendicular to [Shannon's] face." No such particularized demonstration ever

occurred and any "demonstration" that Noel did perform involved no gun whatsoever.

101.    Waters stated that a laptop cord that extended from inside the bathroom through the

doorway into the bedroom was undisturbed. But, Waters had no way of knowing that the laptop

cord was undisturbed.

102.    Attached to the affidavit was a "summary facts." Walters stated that the text message

conversation between Shannon and her male co-worker revealed that they were having "a more

than platonic affair." Waters knew, through his investigation, that Shannon's and her co-

worker's affair was *not* "more than platonic."

103.    Waters' Probable Cause Affidavit was presented to a judge for issuance of an arrest

warrant of Noel Dean, and presented in the Complaint charging Noel Dean with the felony

charge of murder.

104.    Waters' fabrication and misrepresentation of facts denied Noel liberty without due

process of law and as a proximate result of Waters' unconstitutional actions, Noel Dean suffered

damages.

        **Count II:**      **42 U.S.C. § 1983 Claims Against Darshan R. Phatak for Violating Noel Dean's Fourteenth Amendment Due Process and Fair Trial Rights.**

                *a. 42 U.S.C. § 1983 Against Darshan R. Phatak for Violating Noel Dean's Fourteenth Amendment Due Process and Fair Trial Rights by Performing a Biased Autopsy and Death Investigation, Un-separate from Investigator Waters' Influence, and by Improperly Eliminating a Manner of Death Classification.*

105.    Phatak intentionally or recklessly performed a biased autopsy, un-separate from Waters'

murder investigation. Phatak allowed Waters to attend and participate in the autopsy of

Shannon. He allowed Waters to examine the gunshot wound and make determinations such as the cause of an imprint near the gunshot wound.

106.    Phatak received a background on the incident from Waters and Waters' theory and beliefs regarding Shannon's death – that Noel murdered her.

107.    It was clear to Phatak, from the outset of his performance of the autopsy, that Defendant Waters believed Noel murdered Shannon.

108.    On August 6, 2007, Phatak and Chief Medical Examiner Sanchez met with Waters at the office of HCIFS and discussed possible scenarios explaining the forensic evidence.  As a result, Phatak concluded that Shannon's death would not be classified as "undetermined,"  but instead would be classified as either a suicide or homicide.

109.    Phatak's death investigation was, from the beginning, biased and influenced by Waters' attendance, participation, and contribution.

110.    Phatak intentionally or recklessly eliminated a manner of death classification before considering all the evidence.  From the beginning, he concluded that Shannon's death would be classified as either a suicide or homicide, and would not be classified as "undetermined."  When Phatak made these conclusions, he did not have all the information regarding the circumstance of Shannon's death.

111.    Phatak's performance of a pre-disposed, biased death investigation, and his premature elimination of a manner-of-death classification denied Noel liberty without due process of law.  As a proximate result of Phatak's unconstitutional actions, Noel Dean suffered damages.

> b. *42 U.S.C. § 1983 Against Darshan R. Phatak for Violating Noel Dean's Fourteenth Amendment Due Process and Fair Trial Rights by Providing Inaccurate and Inconsistent Witness Testimony and Misrepresenting his Autopsy Findings.*

112.   Phatak intentionally or recklessly misrepresented his autopsy and death investigation findings.  At Noel's 2009 trial, Phatak's testimony was riddled with misstatements, inaccuracies, and glaring inconsistencies.

113.   This carried on through and into Noel's 2011 trial.  At the second trial, Noel's defense was supported by an independent expert medical examiner.  Such expert had reviewed the evidence and was prepared to testify.   After cross-examination of Phatak, Phatak's misstatements, inaccuracies, and inconsistencies led to dismissal of the charges.

114.   Phatak's misrepresentations denied Noel liberty without due process of law, and as a proximate result of Phatak's unconstitutional actions, Noel Dean suffered damages.

**Count III:      42 U.S.C. § 1983 Supervisory Liability Against Luis A. Sanchez and Dwayne A. Wolf.**

115.   Luis A. Sanchez and Dwayne A. Wolf, in their supervisory capacity in the HCIFS, failed adequately to train and supervise Defendant Phatak with respect to basic pathology practices, including conducting a neutral and impartial death investigation, maintaining and considering all manner-of-death classifications until all evidence is reviewed, and fairly and accurately presenting expert testimony in courts of law.

116.   Sanchez and Wolf, in their supervisory capacity, knew, or in the absence of their deliberate or reckless indifference should have known, that in the course of conducting the death investigation of Shannon Dean, Defendant Phatak allowed Detective Waters to pre-dispose and bias the autopsy and death investigation, and Phatak prematurely eliminated a manner-of-death

classification and misrepresented evidence to the Harris County District Attorney's Office and the jury members of Noel's trial.

117. Sanchez and Wolf failed adequately to train or supervise Phatak with deliberate indifference to the known and obvious consequences that deprivation of due process would result.

118. As a direct and proximate result of Sanchez's and Wolf's failure to train or supervise Phatak, Noel Dean was denied due process when Phatak improperly conducted the autopsy and death investigation of Shannon Dean. As the proximate result of such failure, Noel Dean suffered damages.

**Count IV:** **42 U.S.C. § 1983 Claim Against the City of Houston for its Policies or Customs with Respect to Improper Investigative Techniques and Influencing Medical Examiners' Autopsies and Death Investigations.**

119. During 2007 and before, the City's and HPD's official polices or customs were to allow officers and investigators to conduct interrogations without first providing required Miranda Warnings, fabricate or misrepresent evidence obtained from suspects, present such fabrications in Probable Cause Affidavits, and to invade the province and neutrality of the HCIFS's death investigations.

120. The City's final policymakers knew of these policies or customs, and implemented them with deliberate indifference to the likelihood that wrongful indictments and years-long trials would result from them.

121. The City of Houston's and HPD's policies and customs were a moving force behind the denial of due process to Noel Dean in that they directly caused the wrongful police conduct.

122. Noel Dean has been damaged as a proximate result of the City of Houston's and HPD's policies and customs of allowing police officers to conduct illegal interrogations, fabricate or

misrepresent evidence obtained from suspects and presented in Probable Cause Affidavits, and to invade the province and neutrality of the HCIFS's death investigations.

**Count V:      42 U.S.C. § 1983 Claim Against the City of Houston for its Policies or Customs with Respect to Inadequate Training and Supervision of Police Officers.**

123.    During 2007 and before, the City of Houston and HPD had a policy or custom of inadequately training or supervising its police officers and detectives with respect to fundamental investigative techniques and duties, including conducting proper and lawful interrogations, the duty to avoid fabricating and manipulating suspects' statements, the duty to present fair and accurate facts in Probable Cause Affidavits, and the duty to conduct an objective investigation without influencing separate investigative entities such as the ME's office.

124.    The City's and HPD's final policymakers knew of these policies or customs, and implemented them with deliberate indifference to the likelihood that wrongful indictments and years-long trials would result from them.

125.    The City's and HPD's policies and customs were a moving force behind the denial of due process to Noel Dean in that they directly caused a false Probable Cause Affidavit, biased and influenced autopsy findings, misrepresented and fabricated facts, and the erroneous indictment and trials of Noel Dean.

126.    Noel Dean has been damaged as a proximate result of the City's and HPD's policies and customs to inadequately train or supervise its detectives.

**Count VI:      42 U.S.C. § 1983 Claim Against Harris County for its Policies or Customs With Respect To Improper Death Investigations and Jointly-Conducted Autopsies.**

127.    During 2007 and before, Harris County's and HCIFS' official polices or customs were to allow medical examiners to eliminate manner-of-death classifications prior to considering all the

evidence, to provide inaccurate witness testimony, and to conduct biased, police-influenced autopsies and death investigations.

128.   Harris County's and HCIFS' final policymakers knew of these policies or customs, and implemented them with deliberate indifference to the likelihood that wrongful indictments and years-long trials would result from them.

129.   Harris County's and HCIFS' policies and customs were a moving force behind the denial of due process to Noel Dean in that they directly caused the improper Medical Examiners' conduct.

130.   Noel Dean has been damaged as a proximate result of Harris County's and HCIFS' policies and customs of allowing medical examiners to eliminate manner-of-death classifications prior to considering all the evidence and to erase the province and neutrality of the HCIFS's death investigations by permitting police officers to attend and participate in ME's autopsies and death investigations.

**Count VII:** **42 U.S.C. § 1983 Claim Against Harris County for its Policies or Customs With Respect To Inadequate Training or Supervision of Medical Examiners.**

131.   During 2007 and before, Harris County's and HCIFS' official policies or customs were to employ medical examiners who were inadequately trained or supervised with respect to fundamental investigative techniques and duties, including the duty to consider all the evidence before eliminating manner-of-death classifications, the duty to perform a neutral autopsy and death investigation without police influence, and the duty to accurately present findings to courts of law.

132. Harris County's and HCIFS' final policymakers knew of these policies or customs, and implemented them with deliberate indifference to the likelihood that wrongful indictments and years-long trials would result from them.

133. Harris County's and HCIFS' policies and customs were a moving force behind the denial of due process to Noel Dean in that they directly caused an autopsy report that falsely concluded Shannon Dean's death was a homicide and the subsequent indictment and trials of Noel Dean.

134. Noel Dean has been damaged as a proximate result of Harris County's and HCIFS's policies or customs of inadequately training or supervising medical examiners to conduct proper and neutral autopsies and death investigations.

**PRAYER**

135. Plaintiff Noel Dean requests that Defendants be cited to appear and answer, and that on final trial Plaintiff recover:

a. Compensatory damages;

b. Punitive damages against the non-municipal defendants;

c. Costs of suit, including reasonable attorneys' fees under 42. U.S.C. § 1988;

d. Prejudgment and postjudgment interest as allowed by law; and

e. Such other and further relief to which Plaintiff justly may be entitled.

Respectfully submitted,

By: _____/s/_____

**JERRY GALOW**
Attorney-in-charge
Texas State Bar No. 07594400
S.D.T. Admission No. 19219

1204 Nueces Street
Austin, Texas 78701
(512) 481-0200
(512) 481-0250 (FAX)