## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| NOEL T. DEAN, | § | |
| | § | |
|    *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-13-00073 |
| | § | |
| HARRIS COUNTY, *et al.*, | § | |
| | § | |
|    *Defendants*. | § | |

### MEMORANDUM OPINION & ORDER

Pending before the court are (1) three motions to dismiss plaintiff Noel Dean's ("Noel") claims against defendants Darshan R. Phatak ("Phatak"), Luis A. Sanchez ("Sanchez"), and Dwayne A. Wolf ("Wolf") (the "moving defendants")[1] or alternatively, motions for Noel to file a Rule 7(a)(7) reply regarding qualified immunity (Dkts. 16–18); and (2) Noel's three objections to the moving defendants' replies in support of the motions to dismiss. Dkts. 30–32.

Noel's objections (Dkts. 30–32) to the moving defendants' replies are **OVERRULED**. Further, having considered the moving defendants' motions, the responses, the replies, and applicable law, the motions to dismiss or alternative motions for a Rule 7(a)(7) reply (Dkts. 16–18) are **GRANTED IN PART** and **DEFERRED IN PART**. With regard to the Rule 7(a)(7) reply, the moving defendants' requested alternative relief is **GRANTED**, and Noel is **ORDERED** to file a single Rule 7(a)(7) reply no later than 14 days after the date of this order. The moving defendants may then file supplemental briefs in support of their pending motions to dismiss no later than 14 days after the filing of Noel's Rule 7(a)(7) reply. Noel may then respond to the supplemental briefs,

---

[1] At all relevant times, according to the first amended complaint, Sanchez was the chief medical examiner and Wolf was the deputy chief medical examiner of the Harris County Institute of Forensic Sciences ("HCIFS"), formerly known as the Office of the Medical Examiner of Harris County. Dkt. 21 (Noel's first amended complaint) at 6 ¶¶ 15–16. Noel alleges that Sanchez and Wolf had supervisory authority over Phatak, an assistant medical examiner, and all three defendants from HCIFS are sued in their individual capacities. *Id.* at 6 ¶¶ 14–16.

if any, no later than 7 days after their filing. A ruling on the moving defendants' motions to dismiss is therefore **DEFERRED** until after the conclusion of the above briefing schedule. Lastly, the court exercises its discretion in the immunity context and orders that all discovery, related to the moving defendants' qualified immunity defenses and the merits, is **STAYED** pending resolution of the motions to dismiss.

## I. BACKGROUND[2]

This case arises out of the tragic death of Shannon Dean ("Shannon") and the subsequent homicide prosecution against her husband Noel. On July 29, 2007, Noel and Shannon hosted a gathering of family and friends at their home in south-central Houston. Dkt. 21 at 6 ¶ 18. They ate, consumed alcohol, and listened to music. *Id.* The party ended after midnight the next morning, on July 30, 2007. *Id.* at 6 ¶ 19. Noel drove a guest home and returned an hour later. *Id.* at 7 ¶¶ 21–22. By this time, only Noel, Shannon, and a friend remained in the home. *Id.* at 7 ¶ 22. The friend was asleep in the guest bedroom. *Id.*

Noel went to the master bedroom, where Shannon was lying on the bedroom floor due to an illness caused by her intoxication. *Id.* at 7 ¶ 23. As Noel spoke to Shannon about the party, Shannon moved from the floor to the bed. *Id.* Noel checked his and Shannon's cell phones for any text messages regarding the status of the departed guests, and he read a text message on Shannon's phone that indicated that she may have been unfaithful to him. *Id.* at 7 ¶ 24. An argument ensued, and Noel punched the bedroom wall. *Id.* at 7 ¶ 25. Noel then went into the master bathroom and opened a window for air. *Id.* While inside the bathroom, Noel thought he saw Shannon attempting to leave the master bedroom. *Id.*

---

[2] When considering a motion to dismiss for failure to state a claim, the court views the well-pleaded allegations in the live complaint as true and in the light most favorable to the plaintiff. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir. 2012); *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

Noel ran to the bedroom door to stop Shannon, concerned that she might hurt herself. *Id.* at 8 ¶¶ 26–27. Shannon had a history of depression and had previously locked herself in the guest bathroom and attempted to kill herself by cutting her wrist with a straight-edge shaving razor. *Id.* at 8 ¶ 26. But as Noel ran towards the bedroom door, Shannon went to the dresser drawer where Noel kept his gun. *Id.* at 8 ¶ 27. Shannon took the gun, ran into the master bathroom, and attempted to close the door behind her. *Id.* Noel pursued her and reached the door before it closed. *Id.*

Shannon lay on the floor of the master bathroom and put the gun to her head. *Id.* ¶ 28. As Noel stood in the doorway, Shannon asked "Is this what you want?" *Id.* Noel responded "no," but Shannon pulled the trigger. *Id.* She died soon thereafter. *Id.* Noel called emergency personnel, and Houston Police Department ("HPD") officers arrived at 4:15 a.m. *Id.* at 8 ¶¶ 29–30. As the officers evaluated the scene, Noel was placed in the back of different patrol cars. *Id.* at 8 ¶ 30. Noel submitted to a gunshot residue test, but it proved inconclusive. *Id.* at 8 ¶ 31.

At 7:50 a.m., officer Millard Waters ("Waters"), a defendant in this case, arrived at the scene. *Id.* at 9 ¶ 33. Waters interviewed the remaining guest at the home, Doneshia Blount. *Id.* He then decided to interview Noel, and Waters took Noel to HPD's Homicide Division office. *Id.* Waters's interrogation of Noel began at 9:30 a.m. and concluded at 11:40 a.m. *Id.* at 10 ¶¶ 41–43. Waters interrogated Noel again that afternoon at 1:55 p.m., and the second interrogation concluded at 3:20 p.m. *Id.* at 11 ¶¶ 45–46. Waters described both interrogations as non-custodial, and he did not administer *Miranda* warnings during either session.[3] *Id.* at 10–11 ¶¶ 42, 45.

---

[3] In 1966, the Supreme Court's *Miranda* decision established "certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation." *Duckworth v. Eagan*, 492 U.S. 195, 201, 109 S. Ct. 2875 (1989) (citing *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966)). *Miranda* prescribes the following four warnings familiar to every student of criminal procedure and police procedural dramas from *Hill Street Blues* to *Law & Order*: "[A suspect] must be warned prior to any questioning [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479. The warnings are only required

3

During the interrogation sessions, Noel maintained that Shannon shot herself and that he did not fire the weapon. *Id.* at 11 ¶ 47. Noel claims that he used his hand as a gun in the interrogations to explain what happened, and he placed his index finger on his right temple. *Id.* Although Noel alleges that Waters never asked how Shannon pointed the gun at her head, Waters indicated in his report that he asked the question three times and Noel demonstrated that Shannon held the pistol "'to signify the front sight had been at about eleven or twelve o'clock on Shannon's temple/head, with the stock/magazine well pointing down toward her feet.'" *Id.* at 11 ¶¶ 48–49. Noel states, however, that he never referred to the angle of the pistol relative to a clock or other similar method of measurement. *Id.* at 11 ¶ 49. Noel claims that Waters twisted the demonstration in his police report to fit his pre-set theory that Noel murdered Shannon. *Id.* at 11 ¶ 48.

The following day, July 31, 2007, Dr. Phatak performed Shannon's autopsy, which Waters attended. *Id.* at 12 ¶ 54. Waters explained the incident's background to Phatak and shared his theory and beliefs regarding Shannon's death. *Id.* at 12 ¶ 56. On August 6, 2007, Waters met with Dr. Phatak and Sanchez at the medical examiner's office. *Id.* at 12 ¶ 57. Waters discussed possible scenarios explaining the forensic evidence, but he did not inform Dr. Phatak that information existed that Shannon had tried to commit suicide before this incident. *Id.* at 12 ¶¶ 57–58.

After meeting with the medical examiner, Waters drafted a probable cause affidavit and presented it to a judge for issuance of an arrest warrant and included it with the charging instrument. *Id.* at 12 ¶ 59. Noel alleges that Waters put several incorrect and fabricated facts in the affidavit, and Waters failed to mention any facts relating to Shannon's suicidal tendencies or previous suicide

---

before "custodial" interrogation, that is, when a suspect is placed under formal arrest or "when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988) (en banc). Thus, the issue of whether Waters should have administered the *Miranda* warnings during either or both of his interrogations of Noel includes a consideration of whether Noel was "in custody" for *Miranda* purposes at the time of questioning. *United States v. Pofahl*, 990 F.2d 1456, 1487 (5th Cir. 1993).

4

attempts. *Id.* at 13 ¶¶ 63–64. Waters continued to misrepresent the facts as a witness at Noel's first and second murder trials. *Id.* at 14 ¶¶ 65–66.

With regard to Dr. Phatak's conduct, Noel alleges that Dr. Phatak performed a biased autopsy and allowed Waters to attend and influence the conclusions. *Id.* at 14 ¶¶ 68–69. Then, when Dr. Phatak met with Waters and Sanchez, the chief medical examiner, on August 6, 2007, Dr. Phatak told Waters that Shannon's manner of death would either be classified as homicide or suicide, and it would not be labeled "undetermined." *Id.* at 15 ¶ 75. Noel alleges that Dr. Phatak falsified his autopsy report, categorizing Shannon's death as a "homicide." *Id.* at 16 ¶ 77.

On January 30, 2008, a grand jury indicted Noel for murder. *Id.* at 16 ¶ 81. Noel twice stood trial for murder in January 2009 and 2011. *Id.* Dr. Phatak's testimony at both trials was, according to Noel, "riddled with misstatements, inaccuracies, and glaring inconsistencies." *Id.* at 16 ¶ 79. During the second trial, after the cross-examination of Dr. Phatak, Harris County prosecutors dismissed the murder charges against Noel. *Id.* at 16 ¶¶ 80, 82.

On January 10, 2013, Noel filed his original complaint and alleged violations of his due process rights by the moving defendants, Waters, Harris County (the "County"), and the City of Houston (the "City"). Dkt. 1 (Noel's original complaint). On March 1, 2013, Noel amended his complaint to add further factual allegations after the moving defendants filed the motions to dismiss. *See* Dkt. 21.

In the amended complaint, Noel alleges that the individual defendants violated his due process rights in multiple ways. First, he alleges that Waters's illegal interrogations of Noel without providing *Miranda* warnings; manipulations of Noel's statements as described in the police report; withholding of material evidence from, and other improper influences of, Dr. Phatak's autopsy and death investigation; and misrepresenting and fabricating facts in the probable cause affidavit,

5

resulted in Noel's wrongful indictment and two trials over three years. *Id.* at 17 ¶ 83. Second, Noel alleges that Phatak falsified the autopsy report, intentionally allowed Waters to bias the autopsy and death investigation, and prematurely eliminated a manner of death classification, all of which contributed to Noel's indictment and murder trials. *Id.* at 17 ¶¶ 84–85. Third, Noel alleges that Sanchez and Wolf are liable under 42 U.S.C. § 1983 in their supervisory capacity for acting with deliberate or reckless indifference in failing to train and supervise Phatak with respect to basic pathology practices and proper death investigations. *Id.* at 23–24 ¶¶ 116–19.

As to the City, Noel alleges two § 1983 claims for policies and customs that permitted HPD officers to interrogate suspects unlawfully, to fabricate and manipulate material evidence, and to influence separate entities, including HCIFS, in an improper manner during a criminal investigation. *Id.* at 24–25 ¶¶ 120–27. Finally, Noel alleges two § 1983 claims against the County for policies and customs that permitted HCIFS medical examiners to eliminate manner-of-death classifications prior to full consideration of the evidence, to provide inaccurate witness testimony, and to conduct biased autopsies and death investigations. *Id.* at 26–27 ¶¶ 128–35.

Each of the moving defendants filed motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkts. 16–18. Phatak contends that Noel's claims against him should be dismissed on grounds that Noel's allegations do not overcome Phatak's assertion of qualified immunity. Dkt. 18 at 6–7. Specifically, Phatak contends that Noel has merely alleged that Phatak negligently conducted an improper death investigation, and this conduct does not violate Noel's due process rights under the Fourteenth Amendment to the United States Constitution. *Id.* Wolf and Sanchez move to dismiss on similar grounds, arguing that Noel's supervisory claim against them fails because the allegations against Phatak do not state a constitutional violation. Dkt. 16 at 7–8; Dkt. 17 at 7–8. Alternatively, the moving defendants move for Noel to file a Rule 7(a)(7)

6

reply, colloquially referred to in this context as a *Schultea* reply,[4] to identify the relevant constitutional rights and clarify the factual allegations that, if proven, would overcome the moving defendants' assertions of qualified immunity. *See* Dkt. 16 at 8; Dkt. 17 at 8; Dkt. 18 at 8. Noel responded to the motions, and the moving defendants replied.

Before proceeding with its substantive analysis, the court will first outline the legal standards applicable to motions to dismiss and *Schultea* replies, and the court will then turn to a discussion of the background law for § 1983 claims alleging fabrication of evidence and investigative misconduct.

## II. LEGAL STANDARD

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99 (1957)). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [but] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* In other words, to overcome a motion to dismiss for failure to state a claim, the complaint must contain sufficient factual allegations, when accepted as true, to "state a claim to relief that is

---

[4] This pleading derives it name from the Fifth Circuit's seminal opinion on the order of pleading in qualified immunity cases, *Schultea v. Wood*, 47 F.3d 1427 (5th Cir. 1995) (en banc). In *Schultea*, the Fifth Circuit recounted the historical place for a reply to an initial responsive pleading. *Schultea*, 47 F.3d at 1432–33. Under both common law and code pleading, a reply was required to any new matter asserted in an initial responsive pleading, lest the claimant risk admitting a matter not specifically denied. *Id.* at 1433. Upon the adoption of the Federal Rules, plaintiffs no longer were required to respond to such matters, and because no response was required, Rule 8(d) specifies that new allegations in an answer are deemed denied. *Id.* The drafters of the Federal Rules, however, retained the reply for use in narrow circumstances when a response to new allegations would be particularly helpful to the court's consideration of the issues. *Id.* The Fifth Circuit found the assertion of qualified immunity to fall within this category: "When a public official pleads the affirmative defense of qualified immunity in his answer, the district court may, on the official's motion or on its own, require the plaintiff to reply to that defense in detail. By definition, the reply must be tailored to the assertion of qualified immunity and fairly engage its allegations." *Id.*

plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009). Plaintiff demonstrates a "plausible" claim when he provides enough facts to create a reasonable expectation that discovery will produce further evidence tending to establish his claim. *Twombly*, 550 U.S. at 556. "Conversely, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Twombly*, 550 U.S. at 558 (internal quotation marks omitted)).

In testing the sufficiency of plaintiff's § 1983 claims when qualified immunity of a public official is asserted, the court has the discretion to order plaintiff to file a reply tailored to the qualified immunity issues. *Schultea*, 47 F.3d at 1433–34. The court's discretion in this context is limited, as the *Schultea* court explained that "[v]indicating the immunity doctrine will ordinarily require such a reply, and a district court's discretion not to do so is narrow indeed when greater detail might assist." *Id.* at 1434. To pass muster at the pleading stage, a *Schultea* reply must be pled with precision and specificity as to the facts demonstrating the illegality of the defendant's conduct at the time of the incident. *Id.*; *see also Wicks v. Miss. State Emp't Servs.*, 41 F.3d 991, 995 (5th Cir. 1995). The court may decline to allow discovery until it finds that the plaintiff has met the heightened pleading requirement, either in the complaint or subsequent *Schultea* reply. *Reyes v. Sazan*, 168 F.3d 158, 161 (5th Cir. 1999).

### III. BACKGROUND LAW

**A.     Section 1983 Liability and Immunity Defenses**

State actors are subject to civil liability when, "under color of any statute, ordinance, regulation, custom, or usage, of any State" that official subjects, or causes to be subjected, a person "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

8

42 U.S.C. § 1983. For a plaintiff to state a § 1983 claim, he "must first show a violation of the Constitution or of federal law, and then show that the violation was committed by someone acting under color of state law." *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 252–53 (5th Cir. 2005). But public officials sued in their personal capacity for money damages under § 1983 may be able to assert a common-law defense of absolute or qualified immunity from suit. *Imbler v. Pachtman*, 424 U.S. 409, 418–19, 96 S. Ct. 984 (1976) (affirming that section 1983 "is to be read in harmony with general principles of tort immunities and defenses rather than in derogation of them"). Generally speaking, judges, prosecutors, witnesses, and legislators may assert absolute immunity for functions related to the judicial process, while executive officials may assert a qualified immunity defense, which was the case at common law. *Pierson v. Ray*, 386 U.S. 547, 553–54, 87 S. Ct. 1213 (1967) (holding that judges retained their historical absolute immunity under § 1983 for performing judicial functions); *Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 113 S. Ct. 2606 (1993) (holding that "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity"); *Briscoe v. LaHue*, 460 U.S. 325, 329–30, 103 S. Ct. 1108 (1983) (holding that a government official is absolutely immune when performing the function of a witness in a criminal trial); *Bogan v. Scott-Harris*, 523 U.S. 44, 49–50, 118 S. Ct. 966 (1998) (holding that any official performing a legislative function is entitled to absolute immunity for those activities). In particular, *Briscoe*'s holding regarding the absolute immunity of witnesses is itself not absolute; pre-testimonial investigative activities and testimony outside of adversarial judicial proceedings are subject to qualified immunity. *Keko v. Hingle*, 318 F.3d 639, 642–44 (5th Cir. 2003) (holding that an expert witness's testimony at an *ex parte* probable cause hearing was not shielded by absolute immunity).

*Keko* provides the analytical framework for determinations of which type of immunity applies. If an official is a participant in adversarial judicial proceedings, he generally will be afforded absolute immunity related to those acts. *Id.* at 642–43. But that same official may also perform activities of an administrative or investigative nature, and those activities will be subject to the lesser protection of qualified immunity. *Id.*; *see also Kalina v. Fletcher*, 522 U.S. 118, 127, 118 S. Ct. 502 (1997) (holding that "in determining immunity, we examine the nature of the function performed, not the identity of the actor who performed it") (internal quotation marks omitted).

When an official asserts qualified immunity, the first step is to identify the allegedly infringed constitutional right. *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865 (1989).

> If the allegations do not establish a violation of a constitutional right, the [official] is entitled to qualified immunity. . . . If the allegations could make out a constitutional violation, we must ask whether the right was clearly established—that is, whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted. . . . If an [official] makes a reasonable mistake as to what the law requires, [he] is entitled to immunity.

*Price v. Roark*, 256 F.3d 364, 369 (5th Cir. 2001) (citations and quotation marks omitted).

A constitutional right is "clearly established" when "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Atteberry*, 430 F.3d at 256 (internal quotation marks omitted). The conduct need not be prohibited by a specific judicial mandate; rather, the unlawfulness need only be "readily apparent from relevant precedent in sufficiently similar situations." *Id.* at 257.

A civil rights plaintiff may bring a § 1983 suit to enforce a number of federal constitutional rights against defendants purportedly acting under color of state law. But perhaps the greatest source of constitutional claims for such plaintiffs is the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The Due Process Clause provides three types of constitutional claims: (1) claims asserting deprivation of a right or rights originally found within the

Bill of Rights, as applied to the states under the theory of selective incorporation; (2) claims asserting the deprivation of interests protected by the Clause's substantive component that bars "certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them"; and (3) claims asserting unfair procedures employed in the deprivation of an interest in life, liberty, or property. *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S. Ct. 975 (1990) (internal quotation marks omitted); *see also McDonald v. City of Chicago*, 130 S. Ct. 3020, 3034–36 (2010) (recounting the Supreme Court's history of selectively incorporating certain protections from the Bill of Rights into the Fourteenth Amendment's Due Process Clause). In each type of due process claim, the plaintiff must identify the protected interest at issue, as it must arise within the rubrics of "life, liberty, or property." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (recounting the Court's substantive due process jurisprudence, stating that "in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes [certain unenumerated rights to bodily integrity and marital freedom]").

The court now moves from a general discussion of due process to the specific issues presented in this § 1983 suit.

**B.     Section 1983 Claims Alleging Wrongful Conduct in Indictments & Prosecutions**

In any case addressing the scope of the Due Process Clause's protections against wrongful conduct with regard to indictments and prosecutions, a court should first consider the Supreme Court's plurality and concurring opinions in *Albright v. Oliver*, 510 U.S. 266, 114 S. Ct. 807 (1994). Illinois authorities issued an arrest warrant for Kevin Albright based on the testimony of an undercover informant, charging him with the sale of a substance that appeared to be an illicit drug.[5]

---

[5] The Illinois Controlled Substances Act prohibits the possession, manufacture, and distribution of so-called "look-alike" substances, which the Act defines as non-controlled substances that are made to resemble, or are represented to be, controlled substances. 720 ILL. COMP. STAT. 570/102(y), 570/404(b). The Act specifies certain factors, including

11

*Id.* at 268 & n.1. When Albright learned that an arrest warrant had been issued against him, he voluntarily surrendered to Detective Roger Oliver, while still denying his guilt. *Id.* at 268. Albright posted bond and was released. *Id.*

At a preliminary hearing, Oliver testified that Albright sold the look-alike substance to the undercover informant, and the court found probable cause to bind Albright over for trial. *Id.* at 269. At a subsequent hearing, however, the court dismissed the criminal information on grounds that the charge did not state an offense under Illinois law. *Id.* Albright then filed suit under § 1983, alleging a substantive due process violation when he was denied his liberty interest to be free from a criminal prosecution instituted without probable cause. *Id.* The district court dismissed the complaint on grounds that Albright failed to state a claim for malicious prosecution under § 1983. *Id.* The Seventh Circuit affirmed. *Id.* at 269–70.

The Supreme Court affirmed the dismissal of Albright's complaint, albeit without any reasoning shared by a majority of the Court. Chief Justice Rehnquist's plurality opinion, joined by Justices O'Connor, Scalia, and Ginsburg, found that because Albright submitted to an arrest, his claim, if any, arose under the Fourth Amendment's protections against unlawful seizures and not the Fourteenth Amendment's substantive due process component, with its "scarce and open-ended" guideposts. *Id.* at 275 (citing *Collins v. Harker Heights*, 503 U.S. 115, 125, 112 S. Ct. 1061 (1992)).

Justice Kennedy, joined by Justice Thomas, concurred in the Court's judgment. *Id.* at 281–86 (Kennedy, J., concurring in judgment). Justice Kennedy agreed that due process does not provide a right against the initiation of a malicious prosecution. *Id.* at 281–83 (Kennedy, J., concurring in judgment). Justice Kennedy added that a procedural due process claim might be

---

taste and color, that are relevant to the determination of whether a substance should be classified as a "look-alike." *Id.* 570/102(y). Illinois charged Albright with the sale of a substance purported to be cocaine, but which was actually baking soda. *Albright v. Oliver*, 975 F.2d 343, 344 (7th Cir. 1992).

available in some circumstances to protect a defendant's interest against defamation, but he need not define those contours because the Fourteenth Amendment's Due Process Clause does not provide relief for a random, unauthorized act when state law provides an adequate remedy. *Id.* at 285–86 (Kennedy, J., concurring in judgment) (citing *Parratt v. Taylor*, 451 U.S. 527, 535–44, 101 S. Ct. 1908 (1981)). Justice Souter also concurred in the judgment, but he disagreed with the plurality that a Fourteenth Amendment due process claim, when based on the deprivation of an incorporated right, necessarily precludes a claim based on the deprivation of an individual's other due process rights. *Id.* at 286–87 (Souter, J., concurring in judgment). He found, however, that Albright had not alleged a "substantial burden on liberty" beyond what the Fourth Amendment protects against, and there was thus no need to consider whether substantive due process should provide redress in this case. *Id.* at 291 (Souter, J., concurring in judgment).

The Justices in *Albright* took several routes in their journey through the Fourteenth Amendment, but a majority agreed that a § 1983 litigant may not pursue a substantive due process claim for deprivation of a general liberty interest against the initiation of a prosecution without probable cause. *Id.* at 273 (plurality opinion) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.") (quoting *Graham*, 490 U.S. at 395); *id.* at 283 (Kennedy, J., concurring in judgment) (finding that due process does not include a standard for the initiation of a criminal prosecution). And nine years after *Albright*, the Fifth Circuit adopted this holding and clarified its own caselaw in the area. *Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003) (en banc). The *Castellano* court reiterated *Albright*'s holding and stated as follows:

> The initiation of criminal charges without probable cause may set in force events that
> run afoul of explicit constitutional protection—the Fourth Amendment if the accused

13

>is seized and arrested, for example, or other constitutionally secured rights if a case is further pursued. Such claims of lost constitutional rights are for violation of rights locatable in constitutional text, and some such claims may be made under 42 U.S.C. § 1983.

*Id.* at 953–54.

Numerous constitutional rights may thus be implicated upon the allegedly wrongful initiation of criminal charges against the accused. If the accused later becomes a plaintiff in a § 1983 suit, he must clearly identify the constitutional rights at issue and how he has been deprived of particular liberties for the constitutional violations to accrue.

And in *Brown v. Miller*, 519 F.3d 231 (2008), the Fifth Circuit considered the due process implications of the fabrication and suppression of material evidence. Dennis Patrick Brown was an African-American accused of a 1984 rape of a Caucasian woman in Covington, Louisiana. *Id.* at 234. He was convicted of the crime and sentenced to life in prison. *Id.* Twenty years later, after DNA testing proved he was innocent and led to his release, Brown sued the City of Covington and several police offers relating to alleged pretrial misconduct. *Id.* Brown pursued several Louisiana tort and section 1983 claims alleging deprivations of his rights to a fair trial, equal protection, and due process of law. *Id.* at 235. In particular, Brown accused Nace Miller, the laboratory technician at the Louisiana State crime lab, of overstating and fabricating the results of tests to create misleading and inculpatory evidence against Brown. *Id.* at 237. Brown also accused Miller of concealing or destroying additional tests that would have exculpated Brown of the rape charge. *Id.*

Miller moved to dismiss the claims against him, contending that he was immune from suit. *Id.* at 236. The district court ordered Brown to submit a *Schultea* reply and plead specific facts, if he could, to overcome Miller's assertion of qualified immunity. *Id.* Brown complied, and the district court denied the motion to dismiss. *Id.*

14

On interlocutory appeal, the Fifth Circuit affirmed the district court's denial of Miller's motion to dismiss on the immunity issue. *Id.* at 237–38. The court found that as of 1959 or earlier, it was well-established that a defendant had a due process right to be free from false or fabricated evidence that results in his conviction.[6] *Id.* at 237 (citing *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173 (1959)); *see also Limone v. Condon*, 372 F.3d 39, 44–45 (1st Cir. 2004) ("[T]hose charged with upholding the law are prohibited from deliberately fabricating evidence . . . ."); *Zahrey*, 221 F.3d at 349 (defining a constitutional right "not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity"). The court also found that the alleged deliberate destruction or concealment of exculpatory evidence by an investigating official was a specific right that was defined by the late 1960s in the Fifth Circuit. *Id.* at 237–38 ("Therefore, the law was sufficiently clear in 1984 that a state crime lab technician would have known that suppression of exculpatory blood test results would violate a defendant's rights."); *Brady v. Maryland*, 373 U.S. 83, 86–87, 83 S. Ct. 1194 (1963) (holding that a criminal prosecutor's suppression of exculpatory evidence violated a defendant's right to a fair trial); *Luna v. Beto*, 391 F.2d 329, 332 (5th Cir. 1967) (holding that concealing exculpatory evidence by police officers was a constitutional violation).

In sum, a careful reading of *Albright*, *Castellano*, and *Brown* demonstrates that a criminal defendant alleging a wrongful indictment and trial, upon fabrication of evidence and/or failure of probable cause, might bring several § 1983 claims arising under the Fourteenth Amendment's Due Process Clause. Moreover, after any assertion of qualified immunity, the plaintiff must define the specific constitutional rights at issue, including any rights incorporated from the Bill of Rights, that

---

[6] The defendant's liberty interests may be violated in other ways upon the fabrication of evidence, through any resulting pretrial and trial detention, even upon an acquittal. *See Zahrey v. Coffey*, 221 F.3d 342, 348 (2d Cir. 2000) (finding that the defendant's due process rights were violated upon the fabrication of evidence that resulted in his arrest and eight months of confinement, from bail revocation to acquittal).

15

he alleges were violated and the liberty interests of which he claims he was deprived as a result of the particular constitutional violation.

With this legal background in mind, the court now considers the pending issues in this case.

### IV. ANALYSIS

#### A. Noel's Objections to the Moving Defendants' Replies

The motions to dismiss raise one issue, namely that Noel did not allege a constiutional violation, a prerequisite for a § 1983 claim. Dkt. 16 at 7–8; Dkt. 17 at 7–8; Dkt. 18 at 7–8. Noel responds that he has alleged a recognized due process right, and he added that the right was clearly established at the time of the moving defendants' violation of that right. Dkt. 22 at 10–11; Dkt. 23 at 9–10; Dkt. 24 at 9–10. In their replies, the moving defendants respond that Noel failed to allege that they violated clearly established federal rights at the time of the challenged conduct. Dkt. 25 at 4–5; Dkt. 26 at 3–4; Dkt. 27 at 3–4.

Noel objects to the moving defendants' assertions regarding the immunity elements that were not raised in their opening briefs. *See* Dkts. 30–32. The court generally does not hear arguments asserted for the first time in a movant's reply brief, in order to avoid unfair surprise to the nonmovant. *See United States v. Aguirre-Villa*, 460 F.3d 681, 683 n.2 (5th Cir. 2006). The court has discretion to consider issues in the reply brief in certain circumstances, however, including when the new issue is raised in the nonmovant's brief and the movant responds to that issue in the reply. *United States v. Ramirez*, 557 F.3d 200, 203 (5th Cir. 2009); *Piney Woods Country Life Sch. v. Shell Oil Co.*, 905 F.2d 840, 854 (5th Cir. 1990). In other words, the court may consider a new issue raised in a response brief and joined in the reply. *Ramirez*, 557 F.3d at 203 (citing *Burlington N. & Santa Fe Ry. Co. v. Vaughn*, 509 F.3d 1085, 1093 (9th Cir. 2007)).

Here, the plaintiff briefed the issue of qualified immunity in his responses, both as to the existence of a constitutional right and whether it was clearly established, and the moving defendants responded to his arguments in their reply. The moving defendants did not assert an entirely new issue in their reply brief, and the court thus has the discretion to consider all elements of qualified immunity as part of its evaluation of the motions to dismiss.[7] Noel's objections to the moving defendants' reply briefs (Dkts. 30–32) are **OVERRULED**.

## B.     The Moving Defendants' Motions to Dismiss

As the briefing stands today, the motions to dismiss seek dismissal of Noel's claims on grounds that he has failed to allege that Phatak's allegedly unlawful conduct violated a clearly established federal right, thus precluding personal liability against Phatak and supervisory liability against Wolf and Sanchez. Dkts. 16–18. Noel responds that he pled that Phatak engaged in intentional or deliberately indifferent conduct that violated his Fourteenth Amendment rights. *See, e.g.*, Dkt. 22 at 8 ¶ 27. Noel also claims that at all relevant times in this case, a knowing fabrication of evidence was unconstitutional when a reasonable likelihood existed that the false evidence would have an effect on the decision of the jury. *Id.* at 10 ¶ 33 (citing *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997)).

The court agrees that Noel has pled that Phatak engaged in certain acts that could support a due process claim for fabrication of evidence used in a criminal prosecution. *Brown*, 519 F.3d at 237. But Noel has not clearly linked this alleged violation to a denial of a property or liberty interest. Instead, Noel has merely pled that Phatak's conduct "caused [Noel's] wrongful indictment

---

[7] The court briefly notes Noel's objections that the moving defendants filed their reply briefs outside the 5-day window established by this court's procedures. *See* Judge Gray H. Miller, Court Procedures, 6 § 6(A)(4) (Sept. 4, 2012), http://www.txs.uscourts.gov/district/judges/ghm/procedures.pdf. This window is not absolute, for "[r]eply briefs filed by movants will be considered if submitted before the court rules on the motion." *Id.* Noel's objections to the timeliness of the moving defendants' reply briefs are **OVERRULED**.

17

and three-year trial." Dkt. 21 at 17 ¶ 84. Before proceeding into discovery, Noel must particularly allege which of his Fourteenth Amendment rights have been infringed and the specific liberty or property interests of which he has been deprived.[8] Until Noel repleads and (at least attempts) to meet the pleading standard established in this circuit, the court is unable to determine whether his claims against the moving defendants should survive. The motions to dismiss (Dkts. 16–18) are therefore **DEFERRED** until after Noel files a *Schultea* reply and the parties file supplemental briefing on the issues raised by the motions to dismiss, as discussed below.

C.     **The Moving Defendants' Alternative Motions for a *Schultea* Reply**

The moving defendants alternatively move for Noel to file a *Schultea* reply to allege specific facts setting forth the defendants' precise actions that Noel claims violated a constitutional right and "the specific factual allegations upon which [Noel] relies to establish that the actions of [the defendants] were objectively unreasonable in light of clearly established law." *See* Dkt. 16 at 8; Dkt. 17 at 8; Dkt. 18 at 7–8.

As stated above, the court finds that Noel has not clearly alleged that the moving defendants committed constitutional violations under the Due Process Clause of the Fourteenth Amendment. The court thus finds that the alternative motions for a *Schultea* reply should be **GRANTED**. Noel is therefore **ORDERED**, within fourteen days of the date of this order, to file a single *Schultea* reply

---

[8] Noel relies on the Sixth Circuit's *Stemler* decision, which affirmed the longstanding principle that a knowing use of false or fabricated evidence deprives the defendant of a fair trial when there is a reasonable likelihood that the evidence could have affected the judgment of the jury. *Stemler*, 126 F.3d at 872; *United States v. Bagley*, 473 U.S. 667, 678, 105 S. Ct. 3375 (1985) ("[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.") (internal quotation marks omitted). Noel has not specifically pled, however, how Phatak's alleged fabrication of evidence affected his rights to a fair trial and what liberty interests were infringed by Phatak's conduct, both of which are required to be pled with specificity to pass beyond the pleading stage in a § 1983 suit. *See Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460, 109 S. Ct. 1904 (1989) (explaining that a procedural due process analysis addresses two questions: the "first asks whether there exists a [life,] liberty or property interest which has been interfered with by the state; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient") (citations omitted).

18

providing specific facts against each of the moving defendants and alleging (1) which of his specific constitutional rights each moving defendant violated; and (2) the facts upon which Noel relies to establish that each moving defendant's actions were objectively unreasonable in light of clearly established law. The moving defendants may respond to Noel's *Schultea* reply according to the briefing schedule set forth in the conclusion to this order.

The *Schultea* court further held that "[t]he district court need not allow any discovery unless it finds that plaintiff has supported his claim with sufficient precision and factual specificity to raise a genuine issue as to the illegality of defendant's conduct at the time of the alleged acts." *Schultea*, 47 F.3d at 1434. This court finds that discovery should only proceed once it is satisfied that Noel has pled sufficient facts that, if proven, would overcome the moving defendants' assertions of qualified immunity. All discovery is **STAYED** pending resolution of the moving defendants' motions to dismiss after the briefing schedule described in the conclusion, *infra*.

## V. CONCLUSION

Noel's objections (Dkts. 30–32) to the moving defendants' replies are **OVERRULED**. Further, the moving defendants' motions to dismiss or alternative motions for a *Schultea* reply (Dkts. 16–18) are **GRANTED IN PART** and **DEFERRED IN PART**. With regard to the *Schultea* reply, the moving defendants' requested alternative relief is **GRANTED**, and Noel is **ORDERED** to file a single *Schultea* reply no later than 14 days after the date of this order. The moving defendants may then file supplemental briefs in support of their pending motions to dismiss no later than 14 days after the filing of Noel's *Schultea* reply. Noel may respond to the supplemental briefs, if any, no later than 7 days after their filing. A ruling on the motions to dismiss is therefore **DEFERRED** until after the conclusion of the above briefing schedule. Lastly, the court exercises its discretion in the immunity context and orders that all discovery, related to the moving defendants' qualified immunity defenses and the merits, is **STAYED** pending resolution of the motions to dismiss.

It is so **ORDERED**.

Signed at Houston, Texas on June 5, 2013.

_____
Gray H. Miller
United States District Judge