UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| NOEL T. DEAN, § | |
| § | |
| *Plaintiff*, § | |
| § | |
| v. § | CIVIL ACTION H-13-00073 |
| § | |
| HARRIS COUNTY, *et al.,* § | |
| § | |
| *Defendants*. § | |

**MEMORANDUM OPINION & ORDER**

Pending before the court are three motions to dismiss plaintiff Noel Dean's ("Noel") claims under 42 U.S.C. § 1983 against defendants Darshan R. Phatak ("Phatak"), Luis A. Sanchez ("Sanchez"), and Dwayne A. Wolf ("Wolf") (collectively, the "moving defendants").[1] Dkts. 16–18. On June 5, 2013, the court deferred ruling on these motions and stayed discovery pending further briefing. Dkt. 37. The court ordered Noel to file a *Schultea* reply to clarify his allegations against the moving defendants and plead additional details. *Id.* at 18–19. On July 1, 2013, Noel filed a *Schultea* reply. Dkt. 40.[2]

Having considered the moving defendants' motions, the responses, replies, *Schultea* reply, and applicable law, Phatak's motion to dismiss is **GRANTED IN PART & DENIED IN PART**. Sanchez and Wolf's motions to dismiss are **GRANTED**. The previously entered discovery stay is lifted, and the court will enter a separate Rule 16 scheduling order consistent with this opinion.

---

[1] At all relevant times, according to the first amended complaint, Sanchez was the chief medical examiner and Wolf was the deputy chief medical examiner of the Harris County Institute of Forensic Sciences ("HCIFS"), formerly known as the Office of the Medical Examiner of Harris County. Dkt. 21 (Noel's first amended complaint) at 6 ¶¶ 15–16. Noel alleges that Sanchez and Wolf had supervisory authority over Phatak, an assistant medical examiner, and all three defendants from HCIFS are sued in their individual capacities. *Id.* at 6 ¶¶ 14–16.

[2] The court invited the moving defendants to file supplemental briefs in response to Noel's reply and in further support of their motions to dismiss, but the moving defendants declined to do so.

I. BACKGROUND[3]

On July 29, 2007, Noel and Shannon Dean ("Shannon") hosted a gathering of family and friends at their home in south-central Houston. Dkt. 21 at 6 ¶ 18. After the party ended early the following morning, Noel drove a guest home and returned an hour later. *Id.* at 7 ¶¶ 21–22. By this time, only Noel, Shannon, and a friend remained in the home. *Id.* at 7 ¶ 22. The friend was asleep in the guest bedroom. *Id.*

Noel went to the master bedroom, where Shannon was lying on the bedroom floor due to an illness caused by her intoxication. *Id.* at 7 ¶ 23. As Noel spoke to Shannon about the party, Shannon moved from the floor to the bed. *Id.* A simmering dispute re-emerged regarding Shannon's alleged infidelity, and she attempted to leave the master bedroom. *Id.* at 7 ¶¶ 24–25. Noel ran to the bedroom door to stop Shannon, concerned that she might hurt herself. *Id.* at 8 ¶¶ 26–27. Shannon had a history of depression and had previously locked herself in the guest bathroom and attempted to kill herself by cutting her wrist with a straight-edge razor. *Id.* at 8 ¶ 26.[4]

As Noel ran towards the bedroom door, Shannon went to the dresser drawer where Noel kept his gun. *Id.* at 8 ¶ 27. Shannon took the gun, ran into the master bathroom, and attempted to close the door behind her. *Id.* Noel pursued her and reached the door before it closed. *Id.* Shannon lay on the floor of the master bathroom and put the gun to her head. *Id.* ¶ 28. As Noel stood in the doorway, Shannon asked "Is this what you want?" *Id.* Noel responded "no," but Shannon pulled the trigger and died soon thereafter. *Id.* Noel called emergency personnel, and Houston Police

---

[3] When considering a motion to dismiss for failure to state a claim, the court views the well-pleaded allegations in the live complaint as true and in the light most favorable to the plaintiff. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir. 2012); *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

[4] Shannon also attempted to commit suicide by ingesting pain pills. Dkt. 21 at 9 ¶ 38. She disclosed both suicide attempts during counseling with her church elders. *Id.* at 9 ¶ 37. Further, she described in a document dated January 31, 2007, recovered after her death, feelings of unworthiness and self-destruction, stating that she imagined being locked in a bathroom with a razor or using Noel's gun to end her own life. *Id.* at 9 ¶ 35.

Department ("HPD") officers arrived at 4:15 a.m. *Id.* at 8 ¶¶ 29–30. As the officers evaluated the scene, Noel was placed in the back of different patrol cars. *Id.* at 8 ¶ 30. Noel submitted to a gunshot residue test, but it proved inconclusive. *Id.* at 8 ¶ 31. The wound itself was a contact wound with no stippling, which, according to the amended complaint, is not uncommon for a self-inflicted wound. *Id.* at 10 ¶ 39.

At 7:50 a.m., officer Millard Waters ("Waters"), a defendant in this case, arrived at the scene. *Id.* at 9 ¶ 33. Waters interviewed the remaining guest at the home, Doneshia Blount. *Id.* He then decided to interview Noel, and Waters took Noel to HPD's Homicide Division office. *Id.* Waters's first interrogation of Noel began at 9:30 a.m. and concluded at 11:40 a.m. *Id.* at 10 ¶¶ 41–43. Waters interrogated Noel again that afternoon at 1:55 p.m., and the second interrogation concluded at 3:20 p.m. *Id.* at 11 ¶¶ 45–46. Waters described both interrogations as non-custodial, and he did not administer *Miranda* warnings during either session.[5] *Id.* at 10–11 ¶¶ 42, 45.

During the interrogation sessions, Noel maintained that Shannon shot herself and that he did not fire the weapon. *Id.* at 11 ¶ 47. Noel claims that he used his hand as a gun in the interrogations to explain what happened, and he placed his index finger on his right temple. *Id.* Although Noel alleges that Waters never asked how Shannon pointed the gun at her head, Waters indicated in his

---

[5] In 1966, the Supreme Court's *Miranda* decision established "certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation." *Duckworth v. Eagan*, 492 U.S. 195, 201, 109 S. Ct. 2875 (1989) (citing *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966)). *Miranda* prescribes the following four warnings familiar to every student of criminal procedure and police procedural dramas from *Hill Street Blues* to *Law & Order*: "[A suspect] must be warned prior to any questioning [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479. The warnings are only required before "custodial" interrogation, that is, when a suspect is placed under formal arrest or "when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988) (en banc). Thus, the issue of whether Waters should have administered the *Miranda* warnings during either or both of his interrogations of Noel includes a consideration of whether Noel was "in custody" for *Miranda* purposes at the time of questioning. *United States v. Pofahl*, 990 F.2d 1456, 1487 (5th Cir. 1993).

report that he asked the question three times and Noel demonstrated that Shannon held the pistol "'to signify the front sight had been at about eleven or twelve o'clock on Shannon's temple/head, with the stock/magazine well pointing down toward her feet.'" *Id.* at 11 ¶¶ 48–49. Noel states, however, that he never referred to the angle of the pistol relative to a clock or other similar method of measurement. *Id.* at 11 ¶ 49. Noel claims that Waters twisted the demonstration in his police report to fit his pre-set theory that Noel murdered Shannon. *Id.* at 11 ¶ 48.

The following day, July 31, 2007, Phatak performed Shannon's autopsy, which Waters attended. *Id.* at 12 ¶ 54. Waters explained the incident's background to Phatak and shared his theory and beliefs regarding Shannon's death. *Id.* at 12 ¶ 56. On August 6, 2007, Waters met with Phatak and Sanchez at the medical examiner's office. *Id.* at 12 ¶ 57. Waters discussed possible scenarios explaining the forensic evidence, but he did not inform Phatak that information existed that Shannon had tried to commit suicide before this incident. *Id.* at 12 ¶¶ 57–58.

Noel alleges that Phatak performed a biased autopsy and allowed Waters to attend and influence the conclusions. *Id.* at 14 ¶¶ 68–69. Specifically, Phatak allegedly allowed Waters to examine the gunshot wound and make causation determinations related to an imprint near the gunshot wound. *Id.* at 14 ¶ 69. Phatak also received a description of the incident from Waters on his theory and beliefs relating to Shannon's death, including his purported belief that Noel killed Shannon. *Id.* at 14 ¶ 70. Lastly, Phatak viewed less than five minutes of Noel's four-hour police statement, at a point on the video pointed out by Waters, in which Noel placed his index finger on his head when explaining that Shannon shot herself. *Id.* at 16 ¶ 78; Dkt. 40 at 4. Then, when Phatak met with Waters and Sanchez, the chief medical examiner, on August 6, 2007, Phatak told Waters that Shannon's manner of death would either be classified as homicide or suicide, and it would not

4

be labeled "undetermined." Dkt. 21 at 15 ¶ 75. Noel alleges that Phatak falsified his autopsy report, falsely categorizing Shannon's death as a homicide. *Id.* at 16 ¶ 77.

The report was reviewed by Sanchez and Wolf, and although both approved of it, Wolf also signed the report. Dkt. 40 at 5 ¶ 10. The findings of the autopsy were the basis of Waters's probable cause affidavit and the issuance of Noel's arrest warrant. *Id.* at 5 ¶ 11. Harris County prosecutors relied on the autopsy report in their indictment and prosecution of Noel. *Id.* He also contends that as a result of his indictment and prosecution, he paid a $5,000 bond to secure his release and was required to report certain travel. *Id.* at 5 ¶ 12. The Social Security Administration suspended Noel from his job, and Texas Southern University suspended him from his position as an assistant coach of the debate team. *Id.*

Noel twice stood trial for murder in January 2009 and 2011. Dkt. 21 at 16 ¶ 81. Phatak's testimony at both trials was, according to Noel, "riddled with misstatements, inaccuracies, and glaring inconsistencies." *Id.* at 16 ¶ 79. During the second trial, after the cross-examination of Phatak, Harris County prosecutors dismissed the murder charges against Noel. *Id.* at 16 ¶¶ 80, 82.

On January 10, 2013, Noel filed his original complaint and alleged violations of his due process rights by the moving defendants, Waters, Harris County (the "County"), and the City of Houston (the "City"). Dkt. 1 (Noel's original complaint). On March 1, 2013, Noel amended his complaint to add further factual allegations after the moving defendants filed the motions to dismiss. *See* Dkt. 21. Noel provided additional details in his *Schultea* reply that was filed on July 1, 2013. *See* Dkt. 40.

In the amended complaint, Noel alleges that the moving defendants violated his Fourteenth Amendment due process and fair trial rights in multiple ways. First, Noel alleges that Phatak falsified the autopsy report, intentionally allowed Waters to bias the autopsy and death investigation,

5

and prematurely eliminated a manner-of-death classification, all of which contributed to Noel's indictment and murder trials. Dkt. 21 at 17 ¶¶ 84–85. Second, Noel claims that Phatak provided inaccurate and inconsistent witness testimony at Noel's 2009 and 2011 trials. *Id.* at 23 ¶¶ 113–14. Third, Noel alleges that Sanchez and Wolf are liable under 42 U.S.C. § 1983 in their supervisory capacity for approving the falsified autopsy report and/or acting with deliberate or reckless indifference in failing to train and supervise Phatak with respect to basic pathology practices and proper death investigations. *Id.* at 23–24 ¶¶ 116–19; Dkt. 40 at 10–11 ¶¶ 26–29.

Each of the moving defendants filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkts. 16–18. Phatak contends that Noel's claims against him should be dismissed on grounds that the allegations do not overcome Phatak's assertion of qualified immunity. Dkt. 18 at 6–7. Specifically, Phatak contends that Noel has merely alleged that Phatak negligently conducted an improper death investigation, and this conduct does not violate Noel's due process rights under the Fourteenth Amendment to the United States Constitution. *Id.* Wolf and Sanchez move to dismiss on similar grounds, arguing that Noel's supervisory claims against them fail because the allegations against Phatak do not state a constitutional violation. Dkt. 16 at 6–8; Dkt. 17 at 6–8. Noel responded to the motions, and the moving defendants replied. Dkts. 22–27. Noel also filed a *Schultea* reply pursuant to Rule 7(a)(7) and this court's June 5 order. Dkt. 40. Noel clarified that his due process claims seek to vindicate the violation of his rights under the Fourth, Fifth, and Sixth Amendments to the United States Constitution. *Id.* at 5–11.

## II. Legal Standard

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

6

555, 127 S. Ct. 1955 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99 (1957)). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [but] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citations omitted). In other words, to overcome a motion to dismiss for failure to state a claim, the complaint must contain sufficient factual allegations, when accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009). Plaintiff demonstrates a "plausible" claim when he provides enough facts to create a reasonable expectation that discovery will produce further evidence tending to establish his claim. *Twombly*, 550 U.S. at 556. "Conversely, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Twombly*, 550 U.S. at 558 (internal quotation marks omitted)).

   As part of the *Twombly-Iqbal* analysis, the court proceeds in two steps. First, the court separates legal conclusions from well-pled facts, as legal conclusions are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 678–80. Second, the court then reviews the well-pled factual allegations, assumes that they are true, and then determines whether they "plausibly give rise to an entitlement to relief." *Id.* at 679.

   When qualified immunity of a public official is asserted in a § 1983 case, the court has the discretion to order plaintiff to file a reply tailored to the qualified immunity issues. *Schultea v. Wood*, 47 F.3d at 1427, 1433–34 (5th Cir. 1995) (en banc). To pass muster at the pleading stage, a *Schultea* reply must be pled with precision and specificity as to the facts showing the illegality of the defendant's conduct at the time of the incident. *Id.* at 1434; *see also Wicks v. Miss. State Emp't*

*Servs.*, 41 F.3d 991, 995 (5th Cir. 1995). The court may decline to allow discovery until it finds that the plaintiff has met the heightened pleading requirement, either in the complaint or subsequent *Schultea* reply. *Reyes v. Sazan*, 168 F.3d 158, 161 (5th Cir. 1999).

### III. BACKGROUND LAW

State actors are subject to civil liability when, "under color of any statute, ordinance, regulation, custom, or usage, of any State," that official subjects, or causes to be subjected, a person "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. For a plaintiff to state a § 1983 claim, he "must first show a violation of the Constitution or of federal law, and then show that the violation was committed by someone acting under color of state law." *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 252–53 (5th Cir. 2005). But public officials sued in their personal capacity for money damages under § 1983 may be able to assert a common-law defense of absolute or qualified immunity from suit. *Imbler v. Pachtman*, 424 U.S. 409, 418–19, 96 S. Ct. 984 (1976) (affirming that section 1983 "is to be read in harmony with general principles of tort immunities and defenses rather than in derogation of them"). Generally speaking, judges, prosecutors, witnesses, and legislators may assert absolute immunity for functions related to the judicial process, while executive officials may assert a qualified immunity defense, which was the case at common law. *Pierson v. Ray*, 386 U.S. 547, 553–54, 87 S. Ct. 1213 (1967) (holding that judges retained their historical absolute immunity under § 1983 for performing judicial functions); *Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 113 S. Ct. 2606 (1993) (holding that "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity"); *Briscoe v. LaHue*, 460 U.S. 325, 343–44, 103 S. Ct. 1108 (1983) (holding that a government official is absolutely immune when performing the function of a witness in a criminal

8

trial); *Bogan v. Scott-Harris*, 523 U.S. 44, 49–50, 118 S. Ct. 966 (1998) (holding that any official performing a legislative function is entitled to absolute immunity for those activities). In particular, *Briscoe*'s holding regarding absolute immunity of witnesses is itself not absolute; pre-testimonial investigative activities and testimony outside of adversarial judicial proceedings are subject to qualified immunity. *Keko v. Hingle*, 318 F.3d 639, 642–44 (5th Cir. 2003) (holding that an expert witness's testimony at an *ex parte* probable cause hearing was not shielded by absolute immunity).

*Keko* provides the analytical framework when determining the type of immunity that applies. If an official is a participant in adversarial judicial proceedings, he generally will be afforded absolute immunity related to those acts. *Id.* at 642–43. But that same official may also perform activities of an administrative or investigative nature, and those activities will be subject to the lesser protection of qualified immunity. *Id.*; *see also Kalina v. Fletcher*, 522 U.S. 118, 127, 118 S. Ct. 502 (1997) (holding that "in determining immunity, we examine the nature of the function performed, not the identity of the actor who performed it") (internal quotation marks omitted).

When an official asserts qualified immunity, the first step is to identify the allegedly infringed constitutional right. *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865 (1989).

> If the allegations do not establish a violation of a constitutional right, the [official] is entitled to qualified immunity. . . . If the allegations could make out a constitutional violation, we must ask whether the right was clearly established—that is, whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted. . . . If an [official] makes a reasonable mistake as to what the law requires, [he] is entitled to immunity.

*Price v. Roark*, 256 F.3d 364, 369 (5th Cir. 2001) (citations and quotation marks omitted).

A constitutional right is "clearly established" when "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Atteberry*, 430 F.3d at 256 (internal quotation marks omitted). The conduct need not be

prohibited by a specific judicial mandate; rather, the unlawfulness need only be "readily apparent from relevant precedent in sufficiently similar situations." *Id.* at 257.

## IV. ANALYSIS

### A. Phatak's Motion to Dismiss

In the amended complaint, Noel alleges two principal claims against Phatak: (1) providing inaccurate and misleading testimony at Noel's trials; and (2) intentional falsification of his autopsy report that led to Noel's wrongful indictment and prosecution. Dkt. 21 at 21–23 ¶¶ 106–15. In his *Schultea* reply, Noel presents additional facts and clarifies that his claims derive from the textual guarantees of the Fourth, Fifth, and Sixth Amendments to the United States Constitution. Dkt. 40 at 5. The court will address Phatak's motion to dismiss as to both of Noel's principal claims in turn.

#### 1. *Phatak's Trial Testimony*

First, Noel contends that Phatak's misrepresentations at trial "denied [him] liberty without due process of law." Dkt. 21 at 23 ¶ 115. Phatak moves to dismiss this § 1983 claim on grounds that he is entitled to absolute immunity for his trial testimony. Dkt. 18 at 8 ¶¶ 17–19. Noel appears to concede this point, implying that absolute immunity covers a government official's trial testimony by stating that "[t]he Fifth Circuit has declined to extend absolute immunity to a forensic examiner's *pre-testimonial* activities." Dkt. 22 at 11 ¶ 36 (citing *Keko*, 318 F.3d at 644) (emphasis added). Noel's concession is correct under the law, as the Supreme Court and the Fifth Circuit have repeatedly made clear that a government witness's testimony at trial, regardless of the alleged improprieties, is absolutely protected against § 1983 liability. *Briscoe*, 460 U.S. at 343–44; *Keko*, 318 F.3d at 642; *Mowbray v. Cameron Cnty.*, 274 F.3d 269, 277 (5th Cir. 2001). As the *Briscoe* Court explained, this immunity serves an important public interest: "Subjecting governmental officials, such as police officers, to damages liability under § 1983 for their testimony might

undermine not only their contribution to the judicial process but also the effective performance of their other public duties." *Briscoe*, 460 U.S. at 343. Noel's § 1983 claim against Phatak relating to the latter's trial testimony will therefore be dismissed.

### 2. *Phatak's Pre-Trial Conduct*

Noel's second set of claims under § 1983 relates to Phatak's performance of Shannon's death investigation and alleged falsification of Shannon's autopsy report. Dkt. 21 at 21–23 ¶¶ 106–12. Noel contends that this misconduct violated his rights against unreasonable searches and seizures under the Fourth Amendment, his due process rights under the Fifth Amendment, and his rights to a fair trial under the Sixth Amendment. Dkt. 40 at 10 ¶ 25.[6]

#### a. Unreasonable Searches and Seizures

Noel alleges that "[b]y falsely categorizing Shannon Dean's death as a homicide and presenting the fabrication to a judge for issuance of an arrest warrant and to state prosecutors in prosecuting [Noel], Phatak violated [Noel's] Fourth Amendment right to be secure in his person against unreasonable seizures and to be free from malicious prosecution." Dkt. 40 at 5–6. As part of the court's first step in the qualified-immunity analysis on a motion to dismiss, the court must determine whether the "'facts alleged show the [official's] conduct violated a constitutional right.'" *Scott v. Harris*, 550 U.S. 372, 377, 127 S. Ct. 1769 (2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151 (2001)).

---

[6] The court pauses briefly to note that because Noel asserts § 1983 causes of action against state governmental actors and entities, he is technically asserting claims under the Bill of Rights that have been incorporated into the Due Process Clause of the Fourteenth Amendment, which applies to the states. *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3034–36 (2010). Nonetheless, for ease of discussion and when necessary, the court will refer to these rights under the original amendments, which by their terms restrain the conduct of the federal government. *Barron ex rel. Tiernan v. Mayor of Baltimore*, 32 U.S. (7 Pet.) 243, 250 (1833) (Marshall, C.J.) ("These amendments contain no expression indicating an intention to apply them to the state governments.").

Here, Noel presents several well-pleaded allegations beyond legal conclusions. He alleges that Phatak discussed and was improperly influenced by Detective Waters's conclusion that Noel murdered Shannon. Dkt. 40 at 3; Dkt. 21 at 14 ¶¶ 67–70. Noel further claims that Phatak told Waters that he would not classify Shannon's manner of death as "undetermined," even before he received all the forensic and toxicology test results. Dkt. 40 at 3–4; Dkt. 21 at 15 ¶ 75–76. Lastly, Noel contends that Phatak disregarded evidence that indicated Shannon committed suicide, including "(1) a self-inflicted scar on Shannon's wrist from one of her two prior suicide attempts, (2) a letter written by Shannon wherein she voiced her feelings of unworthiness, sinfulness, self-destruction, self-infliction of pain, and suicidal desire to end her life with the very gun that, in the end, she used, (3) an apology letter further describing her internal conflicts, and (4) admissions of prior suicide attempts to her church Elders." Dkt. 40 at 4; Dkt. 21 at 9 ¶¶ 35–36. Viewed in the light most favorable to the plaintiff, as the court must on a motion to dismiss, these facts present a plausible entitlement to relief against Phatak for Noel's Fourth Amendment claim based on malicious prosecution and unreasonable seizure. *See Twombly*, 550 U.S. at 555–56; *Castellano v. Fragozo*, 352 F.3d 939, 953–54 (5th Cir. 2003) (en banc) ("The initiation of criminal charges without probable cause may set in force events that run afoul of explicit constitutional protection—the Fourth Amendment if the accused is seized and arrested, for example, or other constitutionally secured rights if a case is further pursued.").

Second, the court evaluates whether "the right was clearly established . . . in light of the specific context of the case." *Harris*, 550 U.S. at 377 (internal quotation marks omitted). As of 2007, a reasonable medical examiner would have understood that intentional fabrication of evidence violated a defendant's right to be free of a wrongful prosecution that caused his pretrial arrest and other deprivations of liberty. *Castellano*, 352 F.3d at 953–54. Accordingly, the court finds that Noel

12

has properly pled a § 1983 claim against Phatak for conduct that violated Noel's clearly-established rights to be free of malicious prosecution and unreasonable seizure.

### b. Due Process

Noel alleges that "Phatak deprived Dean of his liberty interest to be free from a criminal prosecution instituted with and based on falsified evidence." Dkt. 40 at 7–8. Under longstanding precedent, a defendant's rights to due process are violated when he or she is deprived of liberty because of the deliberate fabrication of evidence by a government official acting in an investigative capacity. *See Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173 (1959) (reiterating that "a conviction obtained through use of false evidence, known to be such by representatives of the State" violates due process); *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008) (holding that the knowing creation of a "misleading and materially inaccurate inculpatory serology report," when the results should have been reported as inconclusive, violates a criminal defendant's due process rights); *Limone v. Condon*, 372 F.3d 39, 44–45 (1st Cir. 2004) ("[T]hose charged with upholding the law are prohibited from deliberately fabricating evidence. . . ."); *Zahrey v. Coffey*, 221 F.3d 342, 348 (2d Cir. 2000) (finding that the defendant's due process rights were violated upon the fabrication of evidence that resulted in his arrest and eight months of confinement, from bail revocation to acquittal). Further, at the time of Phatak's autopsy investigation, it was well-settled that defendants had a constitutional right to be free of fabricated evidence used in a criminal prosecution. *Brown*, 519 F.3d at 237 (concluding that "the deliberate or knowing creation of a misleading and scientifically inaccurate serology report amounts to a violation of a defendant's due process rights, and that a reasonable laboratory technician in 1984 would have understood that those actions violated those rights"). Thus, because Noel's well-pleaded facts meet the pleading burden regarding falsification of evidence, *see supra*, and he possessed a clearly-established due process right to be

13

free of such conduct leading to his arrest and prosecution, Noel has stated a due process claim sufficient to defeat Phatak's motion to dismiss on qualified immunity grounds.

### c. Fair Trial Rights

Noel also argues that Phatak fabricated inculpatory evidence and suppressed exculpatory evidence that was either used or excluded from his prosecution, respectively, thereby depriving Noel of his Sixth Amendment right to a fair trial. Dkt. 40 at 9. As stated above regarding Phatak's alleged misconduct, Noel has sufficiently pled an intentional fabrication of evidence, which can also contribute to the violation of Noel's fair trial rights. *See Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) ("When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983."); *Brady v. Maryland*, 373 U.S. 83, 86–87, 83 S. Ct. 1194 (1963) (holding that a criminal prosecutor's suppression of exculpatory evidence violated a defendant's right to a fair trial). Further, Noel has sufficiently pled that these rights were clearly established at the time of Phatak's autopsy investigation and report in 2007. *Ricciuti*, 124 F.3d at 130; *Brown*, 519 F.3d at 238 n.20 (citing *Luna v. Beto*, 391 F.2d 329, 332 (5th Cir. 1967) (holding that concealment of exculpatory evidence by police officers was a constitutional violation, consistent with *Brady*)); *id.* at 238 ("[T]he law was sufficiently clear in 1984 that a state crime lab technician would have known that suppression of exculpatory blood test results would violate a defendant's rights."). Accordingly, as to Noel's Sixth Amendment claims, Phatak's motion to dismiss will be denied.

In sum, as to Phatak's pre-trial conduct, Noel's amended complaint and *Schultea* reply state constitutional claims for relief under the textual guarantees that prohibit unreasonable seizures and

afford due process and a fair trial to a criminal defendant. Phatak's motion to dismiss Noel's constitutional claims of pre-trial investigative conduct will therefore be denied.

**B.     Sanchez & Wolf's Motions to Dismiss**

Noel also pled § 1983 supervisory liability claims against Luis Sanchez and Dwayne Wolf, the chief and deputy medical examiners of HCIFS, respectively. Dkt. 21 at 23–24 ¶¶ 116–19; *id.* at 6 ¶¶ 15–16. Specifically, Noel pled that Sanchez and Wolf inadequately trained and supervised Phatak and knew that Phatak falsified evidence, and acted with deliberate indifference to Noel's constitutional rights. *Id.* at 23–24 ¶¶ 116–18. Sanchez and Wolf filed motions to dismiss, contending that Noel's claims for supervisory liability may not proceed without a showing of an underlying constitutional violation by Phatak, which they argue he did not properly plead. Dkt. 16 at 6–8; Dkt. 17 at 6–8. In his *Schultea* reply, Noel re-alleges his supervisory liability claims, adding that Sanchez and Wolf were personally involved in Noel's constitutional deprivations, "as they reviewed and signed off on Phatak's autopsy report (Wolf signed the report and Sanchez impliedly signed by his approval)." Dkt. 40 at 11 ¶ 27.

When a defendant invokes the qualified immunity defense in a Rule 12(b)(6) motion, the plaintiff must plead sufficient facts that, if proved, would defeat a claim of immunity. *Geter v. Fortenberry*, 849 F.2d 1550, 1553 (5th Cir. 1988). For supervisors, it is hornbook law that they are not liable for a subordinate's actions under any theory of *respondeat superior* or vicarious liability. *Iqbal*, 556 U.S. at 676 (citing *Robertson v. Sichel*, 127 U.S. 507, 515–16, 8 S. Ct. 1286 (1888) ("A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties.")); *Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005). Instead, "a plaintiff must plead that each

15

Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Liability for a supervisor may be properly pled through factual particulars that plausibly indicate that the supervisor either had personal involvement in the constitutional deprivation or that there exists "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987). The personal involvement test requires a showing that the supervisor acted with the same state of mind as the subordinate that allegedly violated a particular constitutional provision. For example, for a claim of invidious discrimination under the First and Fifth Amendments, the plaintiff must plead and prove that the defendant, whether a supervisor or subordinate, acted with discriminatory purpose. *Iqbal*, 556 U.S. at 676; *see also id.* at 682–83 (finding that plaintiff did not state a plausible claim of purposeful discrimination by merely alleging that former Attorney General John Ashcroft and FBI Director Robert Mueller wrongfully adopted a policy of restrictive confinement of high-value detainees after the September 11th terrorist attacks, even if other subordinates may have acted with unconstitutional intent).

Moreover, for the second prong of supervisory liability under a failure-to-train theory, the plaintiff must plead and prove that: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir. 1998). "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 912 (internal quotation marks omitted). And if the plaintiff fails to plead deliberate indifference, he has failed to

plead his claims of supervisory liability properly. *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009).

In this case, Noel alleges that Sanchez and Wolf are liable under § 1983 for their failure to train and supervise Phatak, and on grounds that they were personally involved in Phatak's unconstitutional conduct by reviewing the autopsy case file and either actually or implicitly approving Phatak's challenged report. Dkt. 40 at 10–11 ¶¶ 26–29. However, Noel has failed to plead any actual facts about Sanchez and Wolf, beyond legal conclusions, other than that they reviewed and approved the autopsy report and Sanchez attended one meeting regarding the death investigation. *Id.* But these facts alone does not plausibly give rise to a reasonable inference that Sanchez and Wolf acted with deliberate indifference, a necessary element of supervisory liability, either in their training and supervision of Phatak or in their limited personal involvement in Phatak's conduct. *Porter v. Epps*, 659 F.3d 440, 446–47 (5th Cir. 2011) ("Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.") (internal quotation marks omitted); *Goodman*, 571 F.3d at 395; *Roberts*, 397 F.3d at 293 ("[F]or liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective."). Thus, Noel has not properly pled his § 1983 supervisory liability claims, and Sanchez and Wolf's motions to dismiss will therefore be granted.

**C.     The Discovery Phase**

Lastly, in the court's prior order deferring adjudication of the motions to dismiss, the court stayed discovery pending resolution of the motions. Dkt. 37 at 19. As the court has resolved those motions, the stay will be lifted and the court must decide how discovery will proceed. The parties present two divergent discovery proposals in the parties' Joint Discovery/Case Management Plan.

Dkt. 36. Noel proposes a traditional Rule 16 scheduling order that contains a single period of discovery related to all material issues, including qualified immunity. *Id.* at 4–5. By contrast, the defendants request bifurcated discovery, in which the first phase would focus on alleged violations of constitutional rights and qualified immunity. *Id.* at 7–9. If the court determined that a genuine dispute of material fact existed as to these issues, then the parties would proceed to a second phase of discovery related to the potential liability of the named local government entities (the City and County). *Id.* at 9–10. Defendants claim that the phased approach will promote efficiency because if the court initially determines that Noel's evidence does not create a fact issue as to a constitutional violation, then the municipal defendants cannot be liable and further discovery may be avoided. *Id.* at 9 n.2 (citing *Brown v. Lyford*, 243 F.3d 185, 191 n.18 (5th Cir. 2001) ("[I]f plaintiff does not show any violation of his constitutional rights—then there exists no liability to pass through to the county.")). The court disagrees with the defendants.

The defendants claim that the phased approach will save judicial and party resources, arguing that discovery into the individuals' conduct is distinct from discovery into relevant policies and knowledge of the municipalities. But this assumption rests on a faulty premise, namely that the individual defendants' basis for liability can be neatly segregated from that of the City and County. To the contrary, the individual defendants' knowledge and understanding of potential municipal policies may be relevant to the applicable culpable mental state for § 1983 liability. Bifurcated discovery, rather than a single discovery period, presents a greater risk of unnecessary duplication if Noel requests material that may be relevant to *both* the individual defendants' alleged violations and the policies and practices of the municipalities. Accordingly, the court will enter a scheduling order with a single period of discovery on all issues, consistent with Noel's proposal in the Joint Discovery/Case Management Plan. Dkt. 36 at 4–5.

## V. Conclusion

For the foregoing reasons, Sanchez and Wolf's motions to dismiss (Dkt. 16–17) are **GRANTED**.  Phatak's motion to dismiss (Dkt. 18) is **GRANTED IN PART & DENIED IN PART**.  The discovery stay is lifted, and the court will enter a separate scheduling order consistent with this opinion.

It is so **ORDERED**.

Signed at Houston, Texas on September 17, 2013.

_____
Gray H. Miller
United States District Judge