UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NOEL T. DEAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:13-CV-00073 |
| | § | |
| HARRIS COUNTY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before the Court are Plaintiff Noel T. Dean's Third Amended Complaint (Doc. #135); Defendant Dr. Darshan Phatak's ("Dr. Phatak") Amended Motion for Summary Judgment (Doc. #155), Plaintiff's Response (Doc. #169), and Dr. Phatak's Reply (Doc. #178); the United States Court of Appeals for the Fifth Circuit's January 11, 2019 Opinion regarding Dr. Phatak's Motion for Summary Judgment (Doc. #216); and Dr. Phatak's Supplemental Brief in Support of his Motion for Summary Judgment (Doc. #218). Having considered the parties' arguments, the evidentiary record, the Fifth Circuit's Opinion, and the applicable law, the Court denies Dr. Phatak's Motion for Summary Judgment.

### I. Background

#### a. Factual Background

This civil rights action arises out of the wrongful arrest and prosecution of Plaintiff Noel T. Dean ("Plaintiff") for the murder of his wife. On the evening of July 29, 2007, Plaintiff and his wife, Shannon Dean ("Shannon"), hosted a small gathering of approximately ten friends and family at their Houston-area home. Doc. #135 ¶ 16. Partygoers, including Shannon, consumed

alcohol. *Id.* ¶¶ 16, 18. At some point during the party, Shannon retired to the couple's bedroom due to her intoxication. *Id.* ¶ 18. Plaintiff attended to Shannon to ensure she was okay, then he drove an intoxicated guest home. *Id.* ¶¶ 18–19. Plaintiff returned to his house about an hour later. Shannon was still in the master bedroom, but she was awake and sitting upright on the bedroom floor. *Id.* ¶ 21. By this time, only Plaintiff, Shannon, and a friend remained in the home. *Id.* ¶ 20. The friend was asleep in the guest bedroom. *Id.*

Plaintiff explained the events of the night to Shannon and decided to check her phone for any messages regarding the status of the guests. *Id.* ¶ 22. While doing so, Plaintiff discovered a text message between Shannon and a male co-worker that suggested marital infidelity. *Id.* Shannon had allegedly been unfaithful to Plaintiff before, so a simmering dispute re-emerged between the couple. *Id.* As the dispute settled, Plaintiff thought that Shannon was running towards the master bedroom door in an attempt to leave. *Id.* ¶ 23. Shannon had a history of depression and previously attempted suicide on two occasions—by ingesting pills and by cutting her wrist with a straight-edged razor. *Id.* ¶ 24. Moreover, Shannon wrote about feeling unworthy and expressed feelings of self-destruction and wanting to inflict pain on herself in her personal digital assistant. Doc. #154 at 50–51.[1] Specifically, Shannon considered in her writings the possibility of killing herself with Plaintiff's gun. *Id.* at 51.

Because of this history, Plaintiff ran towards the bedroom door in an attempt to stop Shannon from leaving. But instead of heading towards the door, Shannon went to the dresser drawer where Plaintiff kept his gun. Doc. #135 ¶ 25. Shannon took the gun, ran into the master bathroom, and attempted to close the door behind her. *Id.* Plaintiff reached the bathroom door

---

[1] Doc. #154 is the City of Houston Police Department incident report (the "Incident Report"). The Incident Report was separately filed under seal as an exhibit to Defendants Harris County and Dr. Phatak's Joint Motion for Summary Judgment on the Limitations Issue (Doc. #153).

before Shannon closed it. *Id.* Plaintiff alleges that Shannon laid on the floor of the master bathroom and put the gun to her head. *Id.* ¶ 26. As Plaintiff stood in the doorway, Shannon asked, "Is this what you want?" to which Plaintiff replied, "No." *Id.* Yet, Shannon allegedly pulled the trigger and died shortly thereafter. *Id.* Plaintiff called 911, and officers from the Houston Police Department arrived at 4:15 am. *Id.* ¶¶ 27–28. Plaintiff was placed in the back of a patrol car while officers evaluated the scene. *Id.* ¶ 28. He voluntarily submitted to a gun-shot residue test, but the results were inconclusive. *Id.* ¶ 29.

Around 7:50 am, Detective Millard F. Waters ("Detective Waters"), a defendant in this case, arrived at the scene. *Id.* ¶ 31. Detective Waters first interviewed the friend who remained in the Dean's house after the party, then he decided to question Plaintiff at the station. *Id.* Plaintiff was questioned twice. During both questionings, Plaintiff maintained that Shannon shot herself and placed his index finger on his right temple to demonstrate how she did it. *Id.* ¶ 45. In the Incident Report, Detective Waters stated,

> On three occasions we asked Noel to demonstrate how Shannon had held the pistol. Each time he put his index finger to his right temple with his fingers folded in, to signify the [gun] had been at about eleven or 12 o'clock on Shannon's temple/head, with the [handle] pointing down toward her feet.

Doc. #154 at 26 (all caps removed). Plaintiff asserts that no such particularized demonstration regarding how the pistol was held was ever requested. Doc. #135 ¶ 46.

The following day, on July 31, 2007, Dr. Phatak performed Shannon's autopsy. *Id.* ¶ 52. Detective Waters attended the autopsy. Doc. #169, Ex. 1 at 8:18–20. Before Dr. Phatak began the autopsy, Detective Waters explained the incident's background and shared his theory that Plaintiff murdered Shannon. *Id.* at 8:21–25; Doc. #155 Ex. 1 ¶ 17. He also explained to Dr. Phatak that the interpretation of how the gun was held would ultimately indicate whether Shannon's death was a homicide or a suicide. Doc. #169, Ex. 1 at 9:1–4. Dr. Phatak was made aware of Shannon's

3

suicidal ideations and her previous suicide attempts. Doc. #169, Ex. 3 at 293:25–294:4; *see also* Doc. #155, Ex. 1 ¶ 20. At the conclusion of the autopsy, Dr. Phatak was unable to determine the manner of Shannon's death, so he classified it as "pending" in the draft autopsy report. Doc. #155, Ex. 1 ¶ 20. On August 6, 2007, Dr. Phatak, Dr. Luis Sanchez, Chief Medical Examiner of the Harris County Institute of Forensic Sciences ("Dr. Sanchez"), Detective Waters, among others, met to discuss Shannon's case. *Id.* During the meeting, Detective Waters discussed his two interviews with Plaintiff and the manner Plaintiff described the position of the gun at the time Shannon was shot. *Id.* Detective Waters had the gun that was used during the shooting in a sealed evidence bag. *Id.* While holding the gun, still in the bag, Dr. Phatak attempted to recreate Shannon's position when she was shot. *Id.* He laid on the floor and placed the gun at his temple according to his memory of the autopsy photos of the wound in Shannon's head. Doc. #169, Ex. 1 at 16:25–17:12. Based on his observations of the gun and his recollection of the impressions the gun made in Shannon's head, he concluded that the handle of the gun must have been pointing upwards towards the top of her head, suggesting that the gun was held by someone other than Shannon. Doc. #155, Ex. 1 ¶ 20. Dr. Phatak believed that it was not necessary to compare the actual gun or a similar gun to the wound in Shannon's head because his memory of the autopsy photos and his review of the gun were sufficient. Doc. #169, Ex. 1 at 17:7–12. During the August 6 meeting, Dr. Phatak assured the other attendees that his final autopsy report would be classified as either a homicide or a suicide. Doc. #155, Ex.1 ¶ 21.

Following the August 6 meeting, Dr. Phatak reviewed portions of Plaintiff's videotaped interview with Detective Waters. He specifically focused on the less than five minutes during which Plaintiff described how Shannon had shot herself. *Id.* ¶ 22. He concedes that Plaintiff's demonstration showed the gun in the "handle down" position, but he thought this was a "large

4

discrepancy." *Id.* He also reviewed toxicology reports and photographs of the scene, and he concluded that Shannon was unconscious at the time of the shooting due to her intoxication. Doc. #169, Ex. 1 at 28:10–29:3. However, he later testified that a person with the same blood alcohol concentration as Shannon could also run or pull the trigger of a gun. Doc. #169, Ex. 3 at 272:23–273:8. On August 27, 2007, Dr. Phatak classified Shannon's death as a homicide. Doc. #155, Ex. 1 ¶ 24. According to Dr. Phatak, "the discrepancy between the pattern of the contact gunshot wound as [he] interpreted it to be, *i.e.*, held in the 'handle up' position during the shooting, and the statement of [Plaintiff] . . . during his interview with Detective Waters that the weapon had been held in the 'handle down' position" was the "overriding factor" in his classification of homicide. *Id.* ¶ 29. In fact, he testified that but for Plaintiff's demonstration, he would not have ruled the manner of death a homicide. Doc. #169, Ex. 3 at 299:2–7. Deputy Chief Medical Examiner Dr. Dwayne Wolf ("Dr. Wolf") reviewed and approved Dr. Phatak's conclusion. Doc. #155, Ex. 1 at 37.

Detective Waters used the autopsy report's homicide determination, among other evidence, to support a warrant for Plaintiff's arrest. *See* Doc. #157 at 8.[2] Plaintiff was subsequently indicted and stood trial twice for Shannon's murder. *Id.* The first trial in October 2009 ended in a hung jury. *Id.* The second trial was held in January 2011, during which Dr. Phatak and Dr. Wolf testified. Dr. Phatak maintained that the handle of the gun was upward, and the cause of death was homicide. *See* Doc. #169, Ex. 3 at 247:16–253:16. For his trial testimony, Dr. Wolf opted to prepare photographic overlays that compared the muzzle of the gun with the wound in Shannon's head to demonstrate the orientation of the gun. Doc. #169, Ex. 2 at 7:21–8:17. The photographic

---

[2] Doc. #157 is Detective Waters' Motion for Summary Judgment that was jointly filed with Defendant City of Houston.

5

overlays indicated that the gun was held with the handle down, just as Plaintiff described. *Id.* at 8:18–21. Dr. Wolf, Dr. Sanchez, and Dr. Phatak amended the autopsy report from "homicide" to "undetermined." *Id.* at 9:15–21. As a result, the State dismissed the murder charges against Plaintiff in the middle of the second trial.

### b. Procedural History

This case has a winding procedural history. On January 10, 2013, Plaintiff sued the City of Houston, Harris County, Dr. Phatak, Dr. Sanchez, Dr. Wolf, and Detective Waters in this Court pursuant to 42 U.S.C. § 1983 ("Section 1983"). Doc. #1. As to Dr. Phatak, Plaintiff asserts in his Third Amended Complaint that Dr. Phatak intentionally or with deliberate indifference performed a biased autopsy, falsified his autopsy report, and prematurely eliminated a manner-of-death classification in violation of Plaintiff's rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments of the United States Constitution. Doc. #135. On September 17, 2013, Plaintiff's claims against Dr. Sanchez and Dr. Wolf were dismissed. Doc. #43 at 15–17 (granting Docs. No. 16, 17). In the same Order, the Court also granted Dr. Phatak's Motion to Dismiss in part, finding that he was entitled to absolute immunity for this trial testimony, and denied his Motion to Dismiss as to absolute or qualified immunity for his pretrial conduct. *Id.* at 10–15 (addressing Doc. #18).

The remaining defendants—City of Houston, Harris County, Dr. Phatak, and Detective Waters—subsequently moved for summary judgment on the grounds that Plaintiff's claims were barred by the statute of limitations and/or absolute or qualified immunity. Doc. Nos. 153, 155, 157, 165. On August 30, 2016, the Court held that Plaintiff's claims were not barred by the statute of limitations because limitations began to run in January 2011, when the murder charges against Plaintiff were dismissed. Doc. #193. Further, the Court granted Dr. Phatak's Motion for Summary Judgment as to Plaintiff's Fifth Amendment and malicious prosecution claims and denied the

Motion as to Plaintiff's Fourth, Sixth, and Fourteenth Amendment claims. *Id.* The Court held that Plaintiff presented enough evidence from which a reasonable juror could conclude that Dr. Phatak performed his autopsy report in a manner that was tantamount to falsification of evidence. *Id.* at 12. As such, the Court found that Dr. Phatak was not entitled to qualified immunity. The Court also granted Harris County, Detective Waters, and the City of Houston's Motions for Summary Judgment. *Id.*

On September 27, 2016, Dr. Phatak appealed the Court's August 30 Order denying him qualified immunity. Doc. #194. On January 11, 2019, the Fifth Circuit vacated the Court's Order and remanded the case for the Court to reconsider Dr. Phatak's Motion for Summary Judgment. Doc. #216. In its Opinion, the Fifth Circuit directed the Court to rely on the evidence in the record, not allegations in the pleadings, to determine if there is a genuine dispute as to material facts. *Id.* In April 2019, the Court granted the parties permission to file additional briefing in response to the Fifth Circuit's Opinion. Doc. #217. Dr. Phatak filed supplemental briefing. Doc. #218. The Court now reconsiders Dr. Phatak's Motion for Summary Judgment.

## II. Legal Standards

### a. Federal Rule of Civil Procedure 56

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). "Once the movant does so, the burden shifts to the nonmovant to establish an issue of fact that warrants trial. All reasonable inferences must be viewed in the light most favorable to the party opposing summary judgment, and any doubt must be resolved in favor

of the non-moving party." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 302 (5th Cir. 2020) (cleaned up). Self-serving affidavits and declarations are sufficient to create a genuine issue of material fact so long as the statements are "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 161 (5th Cir. 2021).

### b. Qualified Immunity

Qualified immunity protects government officials sued in their individual capacities "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is an "immunity from suit rather than a mere defense to liability." *Pearson v. Callahan*, 555 U.S. 223, 237 (2009). Once a defendant has invoked qualified immunity, the plaintiff carries the burden of demonstrating its inapplicability. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009).

In *Saucier v. Katz*, the Supreme Court established a two-part framework to determine if qualified immunity applies. 533 U.S. 194 (2001). First, the Court asks whether, in the light most favorable to the injured party, "the facts alleged show the officer's conduct violated a constitutional right." *Id.* at 201. Second, the Court considers whether the allegedly violated right was "clearly established." *Id.* When deciding whether the constitutional right was clearly established, the Court asks whether the law so clearly and unambiguously prohibited the conduct such that a reasonable official would understand that what he was doing violated the law. *Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013). "Answering in the affirmative requires the court to be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity. This requirement establishes a high bar."

8

*Id.* Furthermore, even if "the defendant's actions violated a clearly established constitutional right," the Court then asks whether qualified immunity is nevertheless "appropriate because the defendant's actions were 'objectively reasonable' in light of 'law which was clearly established at the time of the disputed action.'" *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (quoting *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004)).

## III. Analysis

Pursuant to Section 1983, Plaintiff alleges that Dr. Phatak violated his Fourth Amendment right to be free from unreasonable seizures, his Sixth Amendment right to be free from an unfair trial based on falsified inculpatory evidence and suppressed exculpatory evidence, and his Fourteenth Amendment due process right. Doc. #135 at 22–24. Because the Court will rely upon the same evidence for each, the Court will streamline its analysis by addressing all of the claims within the qualified immunity framework.

### a. Constitutional Violation

As to each of Plaintiff's claims, Dr. Phatak asserts that there was no constitutional violation because the alleged falsification of the autopsy that Plaintiff complains about was simply a medical opinion that misinterpreted the pattern injury.[3] *See generally* Doc. #155 at 6–17. Plaintiff avers that Dr. Phatak's acts and omissions—such as being unduly influenced by Detective Waters to reach the homicide conclusion he hoped for, disregarding the abundant evidence that pointed to a suicide, and prematurely eliminating "undetermined" as a possible manner of death—resulted in a false, misleading, and inaccurate autopsy report that caused Plaintiff to be wrongfully arrested,

---

[3] As a preliminary matter, Dr. Phatak suggests, without citing to any authority, that his determination that Shannon's death was a homicide is a medical opinion that is somehow afforded heightened protections that cannot amount to a constitutional violation. *See* Doc. #155 at 6–17. Because Dr. Phatak's assertions are unsupported by law, this argument is unpersuasive.

9

indicted, and twice tried for murder. Doc. #169 at 1, 13–17. Because Dr. Phatak asserts qualified immunity, Plaintiff bears the burden of proving that it does not apply. *Hilton*, 568 F.3d at 194.

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures.'" *Manuel v. City of Joliet*, 580 U.S. 357, 364 (2017). A Fourth Amendment violation may exist when a person is wrongfully arrested "due to knowing or reckless misstatements and omissions." *Winfrey v. Rogers*, 901 F.3d 483, 492 (5th Cir. 2018). A violation of the Sixth Amendment right to a fair trial may arise if exculpatory evidence is concealed. *Brown v. Miller*, 519 F.3d 231, 237–38 (5th Cir. 2008). The right to a fair trial is also violated when false information that is likely to influence a jury's decision is used to prosecute someone. *Dean v. Harris Cnty.*, No. H-13-00073, 2013 WL 5214351, at *7 (S.D. Tex. Sept. 17, 2013) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)). Finally, for a Fourteenth Amendment claim, "[a] criminal defendant's due process rights are violated when the government obtains a conviction with testimony that government agents know is false." *Brown*, 519 F.3d at 237 ("[T]he deliberate or knowing creation of a misleading and scientifically inaccurate . . . report amounts to a violation of a defedant's due process rights . . . .").

Plaintiff contends that there is a genuine dispute of material fact regarding whether Dr. Phatak's acts and omissions amounted to an intentional falsification of the autopsy report in violation of his constitutional rights. Doc. #169 at 13. The Court agrees. Prior to conducting the autopsy, Detective Waters told Dr. Phatak his theory that Plaintiff murdered his wife. Doc. #169, Ex. 1 at 8:21–25; Doc. #155, Ex. 1 ¶ 17. Detective Waters also stressed that Dr. Phatak's interpretation of how the gun was held—handle up versus handle down—would ultimately indicate whether Shannon's death was a homicide or suicide. Doc. #169, Ex. 1 at 9:1–4. Thus, it was evident from the start that the accuracy of the autopsy determination as it pertained to the

orientation of the gun was central to this case. *Id.* And more importantly, Dr. Phatak knew that concluding that Shannon's cause of death was a homicide would likely result in Plaintiff's prosecution. Doc. #155, Ex. 1 ¶ 11 ("My impression was that Detective Waters was hoping that we would discover that the weapon was held with the handle grip up, indicating a manner of death of homicide . . . ."). Despite this, Dr. Phatak admits that the "overriding factor" in his homicide classification was "the discrepancy between the pattern of the contact gunshot wound as [he] interpreted it to be, *i.e.*, held in the 'handle up' position during the shooting, and the statement of [Plaintiff] . . . during his interview with Detective Waters that the weapon had been held in the 'handle down' position." *Id.* ¶ 29. In fact, Dr. Phatak testified during Plaintiff's second trial that but for Plaintiff's demonstration in his interview with Detective Waters, he would not have ruled the manner of death a homicide. Doc. #169, Ex. 3 at 299:2–7. Interestingly, Dr. Phatak admits that prior to determining that this was a homicide, he knew about Shannon's suicidal ideations and prior suicide attempts. *Id.* at 293:25–294:4; *see also* Doc. #155, Ex. 1 ¶ 20. Yet, that evidence did not seem to factor into Dr. Phatak's ultimate determination. Moreover, despite "undetermined" being an appropriate classification for a manner of death, Dr. Phatak stated at the August 6, 2007, meeting, prior to receiving any forensic tests or toxicology reports, that the cause of death would be either a homicide or a suicide. Doc. #155, Ex.1 ¶ 21; Doc. #169, Ex. 3 at 281:21–283:2. The first time Dr. Phatak examined the gun used in Shannon's death was during the August 6 meeting, after he conducted the autopsy. Doc. #155, Ex. 1 ¶ 20. During the meeting, he attempted to recreate Shannon's position when she was shot based on his memory of the autopsy photos and his observations of the gun. Doc. #169, Ex. 1 at 16:25–17:12; Doc. #155, Ex. 1 ¶ 20. He never compared the gun to the wound in Shannon's head, or any photographs thereof, because he believed his memory of the autopsy photos and his review of the gun were sufficient. Doc. #169,

11

Ex. 1 at 17:7–12. While Dr. Phatak was not required to do such a comparison because they are not routinely performed, Dr. Wolf testified that this was the type of case where such a comparison was necessary for an accurate interpretation of the cause of death. Doc. #169, Ex. 2 at 21:2–11. This evidence, taken together, could lead a reasonable juror to conclude that Dr. Phatak intentionally or with deliberate indifference fabricated the autopsy report. As such, a genuine dispute of material fact exists as to whether Dr. Phatak violated Plaintiff's constitutional rights by allegedly fabricating the autopsy report.

### b. Clearly Established Constitutional Right

Further, Dr. Phatak contends that rendering a medical opinion that resulted in an incorrect autopsy report was not a clearly established violation of constitutional rights in 2007. Doc. #155 at 9, 13. In response, Plaintiff relies on the Fifth Circuit's holding in *Brown v. Miller*. Doc. #169 at 18 (citing 519 F.3d 231 (5th Cir. 2008)). In *Brown*, the Fifth Circuit unequivocally held, "A false or scientifically inaccurate report is equivalent to any other false evidence created by investigators, such as a false police report; . . . there is no reason a government scientific expert 'should enjoy immunity greater than that of other investigators.'" *Brown*, 519 F.3d at 237 (quoting *Keko v. Hingle*, 318 F.3d 639, 644 (5th Cir. 2003)). The Court further stated that "the right of criminal defendants to be free from false or fabricated evidence was well settled by 1959 or earlier." *Id.* As such, a reasonable assistant medical examiner in 2007 would have known that falsifying an autopsy report intentionally or with deliberate indifference would violate a defendant's rights.

## IV. Conclusion

In conclusion, the Court finds that Dr. Phatak's Motion for Summary Judgment (Doc. #155) is DENIED as to Plaintiff's Fourth, Sixth, and Fourteenth Amendment claims because Dr. Phatak is not entitled to qualified immunity. Based on the record before this Court, a reasonable juror could conclude that Dr. Phatak falsified the autopsy report intentionally or with deliberate indifference. Moreover, in 2007, a reasonable assistant medical examiner would have known that falsifying an autopsy report would violate a defendant's rights.

It is so ORDERED.

__OCT 2 9 2024__
Date

_____
The Honorable Alfred H. Bennett
United States District Judge